DECISION
ON OBJECTION TO THE MAGISTRATE'S DECISION.
{¶ 1} Relator, John Richardson, filed this original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("the commission") to vacate its order denying relator's application for a scheduled loss award for total loss of use of his left foot, and to enter an order granting such an award. Pursuant to Civ.R. 53 and Loc.R. 12(M) of the Tenth District Court of Appeals, the matter was referred to a magistrate of this court. On January 26, 2005, the magistrate rendered a decision, including findings of fact and conclusions of law, and therein recommended that this court deny the writ. (Attached as Appendix A.) Relator timely filed an objection to the magistrate's decision, which is now before the court.
 {¶ 2} In his objection, relator argues that the magistrate erred in concluding that some evidence supports the commission's finding that relator has not sustained a total loss of use of his left foot, pursuant to the standards set forth in State ex rel. Alcoa Building Products v.Indus. Comm., 102 Ohio St.3d 341, 2004-Ohio-3166, and State ex rel.Walker v. Indus. Comm. (1979), 58 Ohio St.2d 402.
 {¶ 3} In Alcoa, the Supreme Court of Ohio found no abuse of discretion after the commission awarded scheduled loss compensation to an injured worker despite the fact that the claimant retained "some residual utility." The evidence in Alcoa demonstrated that the claimant suffered from residual hypersensitivity, pain and tenderness following amputation of his right forearm such that he was completely unable to use prosthesis. Thus, the claimant could not use the right arm at all, except for minor, residual uses such as petting his dog or pushing open a car door.
 {¶ 4} In Walker, the court upheld an award of scheduled loss compensation for the loss of both legs when the claimant became paraplegic as a result of a work-related injury. Despite the fact that his paralyzed legs had residual function as a lap upon which to rest a book, he still met the standard of unusable "for all practical purposes" in order to satisfy the meaning of "loss" in R.C. 4123.57(B). See Alcoa,
supra, at ¶ 10, citing Walker, supra, and State ex rel. Gassmann v.Indus. Comm. (1975), 41 Ohio St.2d 64, 70 O.O.2d 157, 322 N.E.2d 660. The Walker court held that scheduled loss awards under R.C. 4123.57(B) include situations where the loss is "to the same effect and extent as if [the body part] had been amputated or otherwise physically removed."Walker, at 403.
 {¶ 5} Relator directs our attention to the case of Timmerman Truss,Inc. v. Indus. Comm., 102 Ohio St.3d 244, 2004-Ohio-2589, 809 N.E.2d 15. In that case, the Supreme Court of Ohio granted a writ of mandamus in favor of the employer when the commission granted a loss of use award in reliance upon doctors' reports that did not consider the claimant's actual physical abilities with respect to the body part for which loss of use was being sought. The court noted that * * * a medical assessment as to functional capacity [must] take into consideration the claimant's actual "postrecovery physical and work activities." Timmerman Truss,
supra, at ¶ 30.
 {¶ 6} Relying on Timmerman Truss, relator argues that the evidence upon which the commission relied in denying his request for a scheduled loss award likewise does not sufficiently take into account relator's actual post-recovery situation. He argues that, while he may be ambulatory with the aid of a foot drop brace, he is still entitled to a loss of use award because his "foot is painful with use, it is worse than if it were non-existent * * *." (Objection of Relator, at 4.) But the standards set forth by all of the aforementioned authorities do not turn on the question whether the claimant's overall situation, with respect to pain and suffering, is better or worse than it would have been had his limb been amputated. Therefore, claimant's argument in this regard is not well taken.
 {¶ 7} Rather, when a claimant seeks a scheduled loss award, the proper inquiry is whether, taking into account both medical findings and real functional capacity, the body part for which the scheduled loss award is sought is, for all practical purposes, unusable to the same extent as if it had been amputated or otherwise physically removed. We agree with the magistrate's conclusion that the evidence upon which the commission relied supports its finding that relator's foot does not meet this standard.
 {¶ 8} Relator argues that Dr. Wilkey's report did not address the proper body part (that is, the left foot) because Dr. Wilkey focused on the "sciatic nerve lesion" allowance. However, Dr. Wilkey noted subjective and objective findings with respect to pain in relator's left leg and foot, the fact that relator walks with a "significant limp," "complete loss of active dorsiflexion and eversion" in relator's ankle, and lack of dorsiflexion of the toes, as well as the sensations present in relator's foot. Dr. Wilkey opined that, [a]lthough this injury is significant and debilitating, it does not constitute a total, permanent loss of use. It clearly does not equate with an amputation."
 {¶ 9} In his report, Dr. Gibson explicitly indicated that the question posed to him was whether the allowed conditions have resulted in a total, permanent loss of use of the left foot as if amputated. He equated weight-bearing capability with the absence of a total and permanent loss of use. He took into account the lack of flexion in the foot, as well as the pain, numbness and weakness present. However, he noted that with a foot drop brace relator can ambulate. Based upon this capability, Dr. Gibson opined that the foot is functional and "could not be compared to an amputation or total loss of function of the left foot." The findings in the Wilkey and Gibson reports do not render relator's situation similar to that in Alcoa, where the claimant's partially amputated arm lacked functional capacity because it could be used for little other than petting a dog or pushing open a car door. This case is also not akin toWalker, in which the claimant's paralyzed legs could not be used except as a resting place for reading material or a plate of food.
 {¶ 10} Relator argues that his affidavit, in which he describes the constant pain he experiences in his left foot, demonstrates that the Wilkey and Gibson reports are fatally flawed because they do not take into account relator's chronic pain. But relator's pain need not be considered by these experts or the commission, even under Schultz andTimmerman Truss, if the same does not affect his functional capacity. No expert, including relator's examining physician, Dr. Siegel, reported that relator's pain is so intense and uncontrollable that it renders his foot unable to bear weight, resulting in an inability to walk. Here, the reports of Drs. Wilkey and Gibson establish that relator can walk, albeit with the help of a brace. Thus, the commission did not abuse its discretion in finding that relator has not sustained a total loss of its use. The court cannot imagine a more paramount use for a foot than the activity of walking.
 {¶ 11} After an examination of the magistrate's decision, an independent review of the record pursuant to Civ.R. 53, and due consideration of relator's objection, we overrule the objection, and find that the magistrate made no error of fact or law, and correctly discussed and determined the issues raised. Accordingly, for all of the foregoing reasons, we adopt the magistrate's decision as our own and deny relator's request for a writ of mandamus.
Objection overruled; writ of mandamus denied.
Klatt and Christley, JJ., concur.
CHRISTLEY, J., retired of the Eleventh Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
[State ex rel.] John Richardson,:
 Relator, :
v. : No. 04AP-724
Industrial Commission of Ohio : (REGULAR CALENDAR)
and Pyramid Hill Sculpture Park :
and Museum, :
 Respondents. :
 MAGISTRATE'S DECISION Rendered on January 26, 2005 Gary A. McGee, for relator.
Jim Petro, Attorney General, and William J. McDonald, for respondent Industrial Commission of Ohio.
In Mandamus
 {¶ 12} In this original action, relator, John Richardson, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying his motion for an R.C.4123.57(B) scheduled-loss award for an alleged total loss of use of his left foot, and to enter an award for a total loss of use of his left foot.
Findings of Fact:
 {¶ 13} 1. On November 7, 2001, relator sustained severe industrial injuries when he fell approximately 40 feet from a "cherry picker." The industrial claim is allowed for: "fracture of ilium left; spont pneumothorax bilateral; left lung contusion; spleen injury; fracture of left pubis; fracture of two left ribs; ACQ left ankle; sciatic nerve lesion; impotence organic orig[i]n; pelvic fracture left," and is assigned claim number 01-480385.
 {¶ 14} 2. On June 2, 2003, relator moved for an R.C. 4123.57(B) scheduled-loss award for an alleged total loss of use of his left foot.
 {¶ 15} 3. On August 16, 2003, relator was examined, upon his own request, by Bruce F. Siegel, D.O., who is board certified in family medicine. Dr. Siegel reported:
* * * This man has been evaluated on this date for assessment of his foot drop. * * *
* * * He continues to complain of paralysis of the left foot and must wear a brace to correct the foot drop. He complains of a constant numbness in the first and second toes and the dorsal aspect of the left foot. He has also complained of back pain and limited mobility. Due to his injuries he has limitations in walking, biking, negotiating steps and prolonged standing. He remains under the care of Dr. Mitchell Simons and is treated with Bextra muscle relaxants, Wellbutrin and Remeron. He continues ambulation with the use of a left ankle brace, the use of [a] cane and also continues with his home exercises.
* * * He ambulates with the use of a left ankle brace and demonstrates obvious pronation of the left leg. He is unable to squat on the left leg due to weakness of the foot and is unable to step on a stool leading with his left foot without the use of his upper extremity power for stabilization. Without his ankle brace he has an obvious foot drop. There is significant loss of strength in dorsal flexion and eversion of the left foot measured at 1/5. Circumference of the right calf measures 40-centimeters and diminished atrophy of the left calf has been noted with its circumference measuring 37centimeters. Reflexes measure 2/4 on both prepatella and the right Achilles a trace on the left Achilles. Straight leg raising measures 60-degrees right and 45-degrees left, both with a negative Lasegue's. Diminished sensation is noted over the medial aspect of the left foot, dorsal aspect of the left foot and over the first and second toes. Using the inclinometer for lumbosacral motion the sacral flexion angle measures 30-degrees and the true lumbar flexion angle 30degrees. Extension is measured at 5-degrees with lateral flexion right 20-degrees and lateral flexion left 15-degrees.
Due to this man's injuries from November 7, 2001, he continues to suffer with parasthesia, numbness and weakness of the left foot. These symptoms limit his ability in performing home activities and have prevented him from returning to his work duties. In assessing his level of impairment reference has been made to the Fifth Edition of the AMA Guides for Permanent Partial Impairment. Specific reference has been made to Table 15-7, Page 404 and Tables 15-15, 15-16 and 15-18, Page 424. Due to this man's significant weakness and atrophy of the left foot associated with parasthesia he has required the use of a foot brace. Based upon these findings it is my medical opinion that this man has totally lost the use of his left foot.
 {¶ 16} 4. On September 17, 2003, M.E. Gibson, M.D., performed a file review on behalf of the Ohio Bureau of Workers' Compensation ("bureau"). Dr. Gibson was asked to respond to the following query:
In your medical opinion, does medical evidence support that the allowed injury has resulted in total, permanent loss of use of the left foot. If so, is the loss "as if amputated?" Please be specific.
Dr. Gibson's September 17, 2003 report responds to the query as follows: Claim file(s) reviewed and medical findings accepted as factual.
Mr. Richardson sustained multiple injuries is [sic] November of 2001. Regarding the left foot, a sciatic neuropathy has apparently caused a foot drop. Ordinarily this does not lead to a permanent loss of function of the foot, because weight bearing is usually possible, as is the case in Mr. Richardson.
Mr. Richardson's [sic] was evaluated by Dr. Siegel on 8-16-03. Dr. Siegel's findings included a true foot drop where dorsi-flexion is absent, but plantar flexion was normal according to Dr. Siegel and several other physician's examinations (Dr. Middaugh, Dr. Jobalia). He also has numbness and hypersensitivity in the lower calf and dorsum of the foot, and according to Dr. Siegel, there was also numbness of the great and second toes. An ankle weakness was also noted, but Dr. Jobalia (4-28-03) states there were no neurosensory deficits (numbness) of the left foot, but admits that dorsiflexion is gone, but extension of the ankle is normal. Thus, extension motion is still intact.
He does ambulate and get about with the use of a foot drop brace, and to this extent, the left ankle and foot are functional. Clearly, it could not be compared to an amputation or total loss of function of the left foot. The very fact that ambulation is possible, and certain ankle motions (as plantar flexion) are intact, would not allow for the conclusion that there is total and permanent loss of use of the left foot.
Based on medical documentation in the file there is insufficient evidence to support a total and permanent loss of use of the left foot as being present or causally related to the 11-7-01 injury of record.
 {¶ 17} 5. On October 14, 2003, relator was examined on behalf of the commission by Keith Wilkey, M.D., who specializes in orthopedics. Dr. Wilkey reported:
* * * He has sustained multiple orthopedic injuries and, most significantly, a partial sciatic nerve lesion. The main question today is whether loss of the sciatic nerve function constitutes a total, permanent loss of use. * * * Reference is made to a Physician's Narrative on 17 September 2003 by Dr. Gibson, M.D.
* * *
Pain description. [D]ysesthetic and limited to the left leg only, 5/10, staying the same, exacerbated with palpation.
Treatment. Medications have been used for treatment thus far.
* * *
Observation. This patient uses a cane for ambulation. There is a significant limp. An AFO was presented that has considerable wear consistent with prolonged use.
* * *
Range of motion of knee and ankle. Full passive range of motion is noted. The ankle has complete loss of active dorsiflexion and eversion[.]
Special testing. Positive Tinel's is noted at the popliteal fossa. There is a negative straight leg raise.
N/V testing-there is complete motor loss to the peroneal portion of the sciatic nerve. This means that there is no active dorsiflexion or eversion of the ankle or dorsiflexion of the toes. Interestingly enough, there is near normal sensation to both the superficial and deep branch of the peroneal nerve. The plantar surface of the foot has normal sensation.
* * *
Summary
* * * In terms of the major question asked of me, this nerve injury is partial and this patient has protective sensation to the foot and ankle and has a functional platform from which to ambulate. Although this injury is significant and debilitating, it does not constitute a total, permanent loss of use. It clearly does not equate to an amputation. I disagree with Dr. Siegel's findings and concur with Dr. Gibson's narrative.
The following questions will be answered:
[One] In your medical opinion, has the allowed injuries resulted in a total, permanent loss of use or loss of use as a result of an amputation or contractures? No, see above.
[Two] Your portion identified and discuss[ed] the exact location of the injury and the percentage of loss. The percentage loss of this deficit is calculated from the American Medical Association's Guides to the Evaluation of Permanent Impairment, fifth edition, p. 552. The diagnosis is partial sciatic nerve injury, or more specifically, motor impairment only to the common peroneal nerve branch of the sciatic nerve. Therefore, there is no sensory impairment. However, this patient has significant dysesthetic pain and I would recommend adding 3 percent whole person for impairment secondary to pain. In terms of the motor loss, 17 — 37 indicates that the maximal impairment for the common peroneal nerve is 15 percent whole person or 42 percent lower extremity. Referring to table 16 — 11 on p. 484, no evidence of contractility equals grade 0 muscle function and therefore the multiplier is 100 percent. This constitutes 15 percent whole person or 42 percent lower extremity loss for motor function. Finally, referring to the combined values chart on p. 604, 42 percent lower extremity motor and 3 percent sensory in pain yields a value of 44 percent lower extremity impairment. 44 percent lower extremity impairment is equivalent to 17.6 percent whole person impairment for this nerve injury. 44 percent X 0.4 = 17.6 percent.
6. Following a February 11, 2004 hearing, a district hearing officer ("DHO") issued an order denying relator's motion. The DHO's order states:
It is the finding of the District Hearing Officer that the injured worker has not suffered a total loss of use of his left foot as a result of the allowed industrial accident dated 11/07/2001. This finding is based upon the review reports of Dr. Gibson dated 09/17/2003 and Dr. Wilkey dated 10/14/2003. Specifically, both Dr. Gibson and Dr. Wilkey found that the injured worker is able to ambulate with the use of his left foot, and retains functional ability with the left foot. It is noted that the injured worker needs the assistance of a foot drop brace to ambulate, but the injured worker does still retain the functional capacity to use his foot to ambulate.
Therefore, it is the order of the District Hearing Officer that the injured worker's request for an award of loss of use of left foot is denied.
This order is based upon the medical reports of Dr. Gibson dated 09/17/2003 and Dr. Wilkey dated 10/14/2003.
 {¶ 18} 7. Relator administratively appealed the DHO's order of February 11, 2004.
 {¶ 19} 8. On March 24, 2004, relator executed an affidavit stating:
[Two] Due to the injury to my left foot, I am in constant pain in my left foot.
[Three] My left foot is dropped and but for the brace, I would not be able to walk.
[Four] My left foot is in a brace but due to the pain associated with having anything touch my left foot, I am unable to put on a sock or a shoe.
[Five] The pain in my left foot is constant but becomes greater when my left foot experiences touch, hot or cold sensations.
[Six] Without my left foot brace, I am unable to walk and I can only stand for short periods of time.
[Seven] My left foot will push down at the toes end but will not respond to being pulled up.
[Eight] My left foot hurts worse when the brace is off and the left foot is dropped down.
[Nine] Without the left foot brace, my left foot is useless and is more useless than if it had been amputated due to the chronic pain and instability associated with being unable to walk or stand on my left foot.
[Ten] My brace allows me to push down with the tip of my foot and it causes my foot to rebound to its previous position.
[Eleven] It is my belief that if my foot had been amputated, I would not have the chronic pain in it that I presently experience and that a prosthesis would act in the same way as my brace.
 {¶ 20} 9. Relator's administrative appeal was heard by a staff hearing officer ("SHO") on March 19, 2004. The hearing was recorded and transcribed for the record. During the hearing, the following exchange occurred:
[Relator's Counsel]: And your foot and just referring to your foot, what if anything can you do with your foot?
[Relator]: Not much nothing, I take brace off I can't walk.
* * *
[Relator's Counsel]: Oh, I thought you were using a cane, also, why is that?
[Relator]: That eases a lot of pain off of me, the cane does. I add some weight, I put pressure down on my foot.
[Relator's Counsel]: You have a lot of pain if you'll use your foot?
[Relator]: Yes.
[Relator's Counsel]: And it's hyper-sensitive to heat and cold and moving around and all that stuff?
[Relator]: Yes, so if I can't wear a sock I can't handle nothing till it cover my toes.
[Relator's Counsel]: Without the brace on what if any use is that foot to you?
[Relator]: Same category I'm feeling that it be amputated, about the same category.
[Relator's Counsel]: Without the brace you can't use it at all?
[Relator]: Right.
[Relator's Counsel]:That would be all on that issue.
HEARING OFFICER: His ankle has not been fused?
[Relator's Counsel]: His ankle has not been fused. The ankle still works, the push down for the plantar reflex works, it's bringing it back it doesn't work, and what he has on is a knee flex brace which basically brings the foot back up to a level position after it's used.
So that you can stand on it for a little while but you can't walk on it without the brace?
[Relator]: Right.
 {¶ 21} 10. Following the hearing, the SHO issued an order stating:
The order of the District Hearing Officer, from the hearing dated 02/11/2004, is modified to the following extent: The injured worker's motion, filed 06/02/2003, is denied.
The injured worker's motion requests that the injured worker be paid compensation pursuant to Ohio Revised Code 4123.57 for loss of the use of the left foot.
The Staff Hearing Officer finds that the injured worker has not sustained a total loss of the left foot as a result of the industrial injury of 11/07/2001. The Staff Hearing Officer relies upon the reports of Dr. Gibson and Dr. Wilkey in making this finding. Dr. Gibson advised that the injured worker does ambulate with the use of a foot drop brace and to this extent, the left ankle and foot are functional. Dr. Wilkey opined that although the injured worker's injury is significant and debilitating, the injured worker has a functional platform from which to ambulate. Based upon these findings the Staff Hearing Officer finds that the injured worker's foot retains functional capacity and does not exist as if it had been amputated. Therefore the injured worker's request for compensation for loss of use of the left foot is denied.
This portion of the order is based upon the reports of Dr. Gibson dated 09/17/2003 and Dr. Wilkey dated 10/14/2003.
 {¶ 22} 11. On May 22, 2004, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of April 19, 2004.
 {¶ 23} 12. On July 19, 2004, relator, John Richardson, filed this mandamus action.
Conclusions of Law:
 {¶ 24} Three issues are presented: (1) whether Dr. Wilkey's report fails to constitute some evidence upon which the commission can rely because he examined for loss relating to the sciatic nerve; (2) whether the commission abused its discretion by determining that relator retains significant functional capacity in his left foot through the use of a corrective brace for his foot drop; and (3) whether the commission applied the proper standard for determining whether relator has sustained a total loss of use of his left foot.
 {¶ 25} The magistrate finds: (1) Dr. Wilkey properly examined relator for a loss relating to the sciatic nerve and, thus, his report constitutes some evidence upon which the commission can rely; (2) the commission did not abuse its discretion by determining that relator retains significant functional capacity in his left foot through the use of a corrective brace for his foot drop; and (3) the commission applied the proper standard for determining whether relator has sustained a total loss of use of his left foot.
 {¶ 26} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 27} In State ex rel. Alcoa Building Products v. Indus. Comm.,102 Ohio St.3d 341, 342-343, 2004-Ohio-3166, at ¶ 10, the court succinctly set forth the historical development of scheduled awards for loss of use under R.C. 4123.57(B). The Alcoa court states:
Scheduled awards pursuant to R.C. 4123.57(B) compensate for the "loss" of a body member and were originally confined to amputations, with the obvious exceptions of hearing and sight. In the 1970's, two cases — Stateex rel. Gassmann v. Indus. Comm. (1975), 41 Ohio St.2d 64, * * * andState ex rel. Walker v. Indus. Comm. (1979), 58 Ohio St.2d 402, * * * — construed "loss," as similarly used in R.C. 4123.58, to include loss of use without severance. Gassmann and Walker both involved paraplegics. In sustaining each of their scheduled loss awards, we reasoned that "[f]or all practical purposes, relator has lost his legs to the same effect and extent as if they had been amputated or otherwise physically removed."Gassmann, 41 Ohio St.2d at 67 * * *; Walker, 58 Ohio St.2d at 403-404[.] * * *
 {¶ 28} In Alcoa, the claimant sustained a left arm amputation just below the elbow. Continuing hypersensitivity at the amputation site prevented the claimant from ever wearing a prosthesis. Consequently, the claimant moved for a scheduled-loss award for loss of use of his left arm.
 {¶ 29} Alcoa established through a videotape that the claimant could use his remaining left arm to push open a car door and to tuck paper under the arm. Nevertheless, the commission granted the claimant an award for the loss of use of his left arm.
 {¶ 30} This court denied Alcoa's complaint for a writ of mandamus and Alcoa appealed as of right to the Supreme Court of Ohio.
 {¶ 31} Affirming this court's judgment and upholding the commission's award, the Alcoa court explained, at ¶ 10-15:
* * * Alcoa urges the most literal interpretation of this rationale and argues that because claimant's arm possesses some residual utility, the standard has not been met. The court of appeals, on the other hand, focused on the opening four words, "for all practical purposes." Using this interpretation, the court of appeals found that some evidence supported the commission's award and upheld it. For the reasons to follow, we affirm that judgment.
Alcoa's interpretation is unworkable because it is impossible to satisfy. Walker and Gassmann are unequivocal in their desire to extend scheduled loss benefits beyond amputation, yet under Alcoa's interpretation, neither of those claimants would have prevailed. As the court of appeals observed, the ability to use lifeless legs as a lap upon which to rest a book is a function unavailable to one who has had both legs removed, and under an absolute equivalency standard would preclude an award. And this will always be the case in a nonseverance situation. If nothing else, the presence of an otherwise useless limb still acts as a counterweight — and hence an aid to balance — that an amputee lacks. Alcoa's interpretation would foreclose benefits to the claimant who can raise a mangled arm sufficiently to gesture or point. It would preclude an award to someone with the hand strength to hold a pack of cards or a can of soda, and it would bar — as here — scheduled loss compensation to one with a limb segment of sufficient length to push a car door or tuck a newspaper. Surely, this could not have been the intent of the General Assembly in promulgating R.C. 4123.57(B) or of Gassmann and Walker.
Pennsylvania defines "loss of use" much as the court of appeals did in the present case, and the observations of its judiciary assist use here. In that state, a scheduled loss award requires the claimant to demonstrate either that the specific bodily member was amputated or that the claimant suffered the permanent loss of use of the injured bodily member for all practical intents and purposes. Discussing that standard, one court has written:
"Generally, the `all practical intents and purpose' test requires a more crippling injury than the `industrial use' test in order to bring the case under section 306(c), supra. However, it is not necessary that the injured member of the claimant be of absolutely no use in order for him to have lost the use of it for all practical intents and purposes."Curran v. Walter E. Knipe Sons, Inc. (1958), 185 Pa.Super. 540, 547,138 A.2d 251.
This approach is preferable to Alcoa's absolute equivalency standard. Having so concluded, we further find that some evidence indeed supports the commission's decision. Again, Dr. Perkins stated:
"It is my belief that given the claimant's residual hypersensitivity, pain, and tenderness about his left distal forearm, that he is unable to use his left upper limb at all and he should be awarded for the loss of use of the entire left upper limb given his symptoms. He has been given in the past loss of use of the hand, but really he is unable to use a prosthesis since he has had the amputation, so virtually he is without the use of his left upper limb * * *."
 {¶ 32} Turning to the first issue, it must be noted that the industrial claim is not allowed for the left foot. However, the claim is allowed for "ACQ left ankle" and "sciatic nerve lesion."
 {¶ 33} Notwithstanding that the industrial claim was not allowed for the left foot, relator moved on June 2, 2003, for an award for the total loss of use of the left foot. Relator then submitted the August 16, 2003 report of Dr. Siegel in support of his motion. Dr. Siegel does not list the allowed conditions of the claim and does not connect his examination for loss of use of the left foot to any of the allowed conditions of the claim. He simply assumes a causal connection between the industrial injury and the foot drop and other conditions of the left foot.
 {¶ 34} Dr. Gibson connected relator's left foot problems to one of the allowed conditions by noting that "a sciatic neuropathy has apparently caused a foot drop."
 {¶ 35} Dr. Wilkey also connected relator's left foot problems to one of the allowed conditions when he stated that the main question for his examination "is whether loss of sciatic nerve function constitutes a total, permanent loss of use."
 {¶ 36} Without a connection to an allowed condition of the claim, relator has no claim to a total loss of use of his left foot regardless of the condition of his left foot. See State ex rel. Waddle v. Indus.Comm. (1993), 67 Ohio St.3d 452. Accordingly, relator is in no position here to claim that the report of Dr. Wilkey is flawed for presenting a causal connection between the impairment of the left foot and an allowed condition of the industrial claim.
 {¶ 37} The second issue is whether the commission abused its discretion by determining that relator retains significant functional capacity in his left foot through the use of a corrective brace for the foot drop.
 {¶ 38} Relator's reliance upon State ex rel. General Electric Corp.v. Indus. Comm., 103 Ohio St.3d 420, 2004-Ohio-5585, is misplaced. InGeneral Electric, the court held that a corneal implant lens is corrective rather than restorative and thus, the corneal implant may not be considered in making an award for loss of eyesight under R.C. 4123.57(B) which provides for awards for permanent partial loss of sight of an eye. The statute bars the commission from considering a correction to vision in making the award. The statue states:
"For the permanent partial loss of sight of an eye, the portion of one hundred twenty-five weeks as the administrator in each case determines, based upon the percentage of vision actually lost as a result of the injury or occupational disease, but, in no case shall an award of compensation be made for less than twenty-five per cent loss of uncorrected vision. `Loss of uncorrected vision' means the percentage of vision actually lost as the result of the injury or occupational disease."
General Electric, at ¶ 15.
 {¶ 39} By way of contrast, R.C. 4123.57(B) provides a scheduled award "[f]or the loss of a foot, one hundred weeks." There is no language in R.C. 4123.57(B) indicating that a corrective device, such as the foot drop brace involved here, cannot be considered in determining whether there is a loss of use of the foot.
 {¶ 40} In fact, the Alcoa case cited by relator at least implies that, had the claimant been able to wear a prosthesis on his remaining left arm, the result would have been different. A prosthesis would have extended the functionality of the remaining left arm for the claimant inAlcoa.
 {¶ 41} Here, the relied upon reports of Drs. Gibson and Wilkey indicate that the foot drop brace allows relator to ambulate. Even the report of Dr. Siegel states that "he continues ambulation with the use of a left ankle brace," which is used "to correct the foot drop."
 {¶ 42} Accordingly, the commission did not abuse its discretion by determining that relator retains significant functional capacity in his left foot through the use of a left foot drop brace.
 {¶ 43} The third issue is whether the commission applied the proper standard for determining whether relator has sustained a total loss of use of his left foot.
 {¶ 44} To reiterate, the standard to be applied in cases of alleged loss of use is set forth in Alcoa, supra. The Alcoa court, citing Stateex rel. Gassmann v. Indus. Comm. (1975), 41 Ohio St.2d 64, and State exrel. Walker v. Indus. Comm. (1979), 58 Ohio St.2d 402, indicates that in order to prove entitlement to a scheduled-loss award under R.C. 4123.57(B) for loss of use, the claimant must show that, for all practical purposes, he has lost the body part to the same effect and extent as if it has been amputated or otherwise physically removed. The Alcoa court indicated, by citing the Pennsylvania case, that it is not necessary that the injured member of the claimant be of absolutely no use in order for him to have lost the use of it for all practical intents and purposes.
 {¶ 45} Here, the reports of Drs. Gibson and Wilkey, relied upon by the commission, provide some evidence to support a denial of an award under the standard set forth in Alcoa. Those reports show that relator ambulates with the use of a foot drop brace. The commission, through its SHO, specifically found:
Dr. Gibson advised that the injured worker does ambulate with the use of a foot drop brace and to this extent, the left ankle and foot are functional. Dr. Wilkey opined that although the injured worker's injury is significant and debilitating, the injured worker has a functional platform from which to ambulate. Based upon these findings the Staff Hearing Officer finds that the injured worker's foot retains functional capacity and does not exist as if it had been amputated.
 {¶ 46} Given that the reports of Drs. Gibson and Wilkey support the commission's finding that relator ambulates with his left foot through the use of a foot drop brace, and that such finding clearly shows that relator has not sustained the loss of use of his left foot to the same effect and extent as if it had been amputated, this magistrate must conclude that the commission's order does not show an abuse of discretion with respect to the standard to be applied.
 {¶ 47} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.