DECISION
 IN MANDAMUS ON OBJECTIONS TO MAGISTRATE'S DECISION {¶ 1} Relator, Wheeling-Pittsburgh Steel Corp., commenced this original action requesting a writ of mandamus that orders respondent Industrial Commission of Ohio to *Page 2 
vacate its award of R.C. 4123.57(B) compensation to respondent-claimant Gerald Royal for a total loss of use of his right arm, and to enter an order denying said compensation.
 {¶ 2} Pursuant to Civ.R. 53 and Section (M), Loc.R. 12 of the Tenth Appellate District, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) In his decision the magistrate determined relator's action poses two issues: "(1) whether the commission failed to apply the correct legal standard in determining that claimant has sustained the loss of use of his right arm, and (2) whether the commission relied upon some evidence supporting its finding of right arm loss of use." (Magistrate's Decision, ¶ 23.) Concluding that the commission applied the correct legal standard and relied upon some evidence to support its finding, the magistrate determined the requested writ should be denied. Relator filed objections to the magistrate's decision:
 1. The decision ignores that the Staff Hearing Officer expressly applied a different legal standard than the one prescribed by the Ohio Supreme Court.
 2. There is not "some evidence" to support a finding that claimant lost use of his right hand and the Magistrate's Decision errs by failing to acknowledge that fact.
The magistrate's decision adequately addresses both objections. For the reasons set forth in the magistrate's decision, the objections are not persuasive.
 {¶ 3} As the magistrate explained, the district hearing officer and staff hearing officer both refer to State ex rel. Alcoa Bldg. Productsv. Indus. Comm., 102 Ohio St.3d 341, 2004-Ohio-3166 in determining whether the report of Dr. Rutherford supported claimant's request for compensation for total loss of use of his right arm. In Alcoa, the *Page 3 
Ohio Supreme Court reiterated the test for scheduled loss awards: whether for all practical purposes, the claimant lost the use of the body member to the same extent as if it had been amputated or otherwise physically removed. The court, however, through its citation toCurran v. Walter E. Knipe Sons, Inc. (1958), 185 Pa.Super. 540, 547,138 A.2d 251, clarified that the injured member need not be of absolutely no use in order for the claimant to have lost the use of it for all practical intents and purposes.
 {¶ 4} Nothing in Alcoa suggests that the talismanic use of the phrase "for all practical purposes" is required in determining a loss of use claim. Here, where the orders of the district hearing officer and the staff hearing officer both rely on Alcoa, we cannot say the functional loss use test applied in the commission's orders differs in any significant way from the "for all practical intents and purposes" language employed in Alcoa. Relator's first objection is overruled.
 {¶ 5} Relator's second objection suggests the evidence does not support the award. Dr. Rutherford, on whose report the district hearing officer relied, stated that "since [claimant] uses an abduction pillow under his right upper extremity almost all of the time when he's up and about[,] his right hand and elbow would not be in the position for functional use." Dr. Ward, on whom the staff hearing officer also relied, stated claimant "effectively has lost the use of his right upper extremity." In Alcoa, the doctor's report, which the Supreme Court found sufficient to support the award, stated the claimant there was "virtually * * * without the use of his left upper limb". Id. ¶ 15. The similarity in the doctors' reports supports the commission's order. While relator urges that Dr. Steiman's *Page 4 
report indicates a different conclusion, the commission was not required to rely on his report. Relator's second objection is overruled.
 {¶ 6} Following independent review pursuant to Civ.R. 53, we find the magistrate has properly determined the pertinent facts and applied the salient law to them. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it. In accordance with the magistrate's decision, we deny the requested writ of mandamus.
Objections overruled; writ denied.
 McGRATH and WHITESIDE, JJ., concur.
WHITESIDE, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution. *Page 5 
 MAGISTRATE'S DECISION IN MANDAMUS {¶ 7} In this original action, relator, Wheeling-Pittsburgh Steel Corp., requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to *Page 6 
vacate its award of R.C. 4123.57(B) compensation to respondent Gerald Royal ("claimant") for a total loss of use of his right arm, and to enter an order denying said compensation.
Findings of Fact:
 {¶ 8} 1. On November 4, 1988, claimant sustained an industrial injury while employed as a "pump repairman" for relator, a self-insured employer under Ohio's workers' compensation laws. The industrial claim is allowed for "subluxation bicipital tendon right shoulder; major depression without psychotic features; chronic impinge-ment right shoulder," and is assigned claim number L73349-22.
 {¶ 9} 2. On September 11, 1996, claimant filed an application for permanent total disability ("PTD") compensation. In support of his application, claimant submitted a report dated August 5, 1996, from treating physician Robert H. Bell, M.D., stating:
 * * * I feel quite strongly that he has reached a point of permanent total disability in terms of visibility [sic] to perform any practical, gainful employment in the future. His right shoulder represents a significant problem for him with persistent pain and any attempts at forward elevation or significant problem. * * *
 {¶ 10} 3. The PTD application prompted the commission to have claimant examined by orthopedist James Rutherford, M.D., on February 6, 1997. Dr. Rutherford's report, dated February 19, 1997, states:
 EXAMINATION:
 * * *
 Mr. Royal had really only about 30 degrees of functional flexion or abduction of the right shoulder and he described pain and some prominence of the distal end of the clavicle *Page 7 
with elevation of the shoulder above that level. For this reason he wears an abduction pillow under his right upper extremity which keeps his arm abducted about 45 degrees for the time that he's up and about. * * * Mr. Royal had a 50% loss of grip strength in the right hand. * * *
 DISCUSSION:
 * * * It's my medical opinion that Mr. Royal essentially has no functional residual capacity of his right shoulder and this equates to a 46% permanent partial impairment of the whole person with the reference being Table 18, Page 58 of the AMA Guides to the Evaluation of Permanent Impairment, Fourth Edition. * * *
 * * * [I]t's my medical opinion that Mr. Royal is essentially limited to those job activities that he could do without functional use of his right upper extremity. Since he uses an abduction pillow under his right upper extremity almost all the time when he's up and about his right hand and elbow would not be in a position for functional use. * * *
 OPINION:
 * * * [I]t's my opinion that Mr. Royal cannot use his right upper extremity for any functional work activities. * * * He could not reach overhead or at waist level or knee level or floor level with his right upper extremity.
 * * * [I]t's my opinion that Mr. Royal could * * * do work activities which would not involve any functional use of his right upper extremity. * * *
 {¶ 11} 4. On February 19, 1997, at claimant's own request, he was examined by orthopedic surgeon Richard M. Ward, M.D., who wrote:
 * * * He has had a total of 8 surgical procedures done to the right shoulder. The last one was in January of 1996. He has *Page 8 
not been able to work since April of 1993 because of problems with his right shoulder.
 * * * At the present time he has to wear a bolster type splint to hold his right shoulder fixed in about 20 degrees of abduction. He effectively has lost the use of his right upper extremity. Any attempt at motion of the shoulder causes a severe pain.
 * * *
 * * * He has had eight surgical procedures done on the right shoulder and at this time has a right shoulder that does not demonstrate any motion.
 In examining his left [sic] wrist, there is pain and tenderness volarly on the ulnar side. He does have a fairly full range of motion. * * *
 {¶ 12} 5. In his February 19, 1997 report, Dr. Ward opined that claimant is permanently and totally disabled.
 {¶ 13} 6. Following a July 29, 1997 hearing, a staff hearing officer ("SHO") issued an order awarding PTD compensation beginning August 5, 1996. The SHO's order stated reliance upon the reports of Drs. Rutherford and Bell.
 {¶ 14} 7. Relator moved for reconsideration of the SHO's order of July 29, 1997, and the commission scheduled a reconsideration hearing. Following a March 3, 1998 hearing, the commission denied the PTD application. Claimant pursued a writ of mandamus. Ultimately, inState ex rel. Royal v. Indus. Comm. (2002), 95 Ohio St.3d 97, the court found that the prerequisites necessary to the proper exercise of commission continuing jurisdiction had not been met.
 {¶ 15} 8. On July 22, 2002, an SHO mailed an order that reinstated the SHO's order of July 29, 1997, awarding PTD compensation. *Page 9 
 {¶ 16} 9. On June 28, 2005, citing the reports of Drs. Ward, Bell and Rutherford, claimant moved for R.C. 4123.57(B) scheduled-loss compensation for the alleged loss of use of his "right upper extremity."
 {¶ 17} 10. Claimant's June 28, 2005 motion prompted relator to schedule claimant for an examination to be performed by Gerald S. Steiman, M.D., on August 24, 2005. Dr. Steiman practices neurology. In his report, dated August 26, 2005, Dr. Steiman wrote:
 COMPLAINTS: Asked how his current activities of daily living, including work, social and recreational activities, continue to be affected by his injury, Mr. Royal responded, "Constant pain in shoulder".
 Mr. Royal has extreme severe pain within his right shoulder and cannot move his right shoulder for any functional activities. He states that he does have normal movement and no pain in his wrist and elbow but functions are extremely limited because of his inability to move his shoulder.
 * * *
 OPINION: Mr. Royal's history, medical record review, physical exam and pain assessment fails to provide credible evidence that, for all practical purposes, he has lost the use of the right upper extremity. Mr. Royal's current condition is not similar or equal to that of an individual who has had an amputation of the right upper extremity. Mr. Royal does have full manipulation and capability, does have full range of motion within his right elbow and his right hand. He has normal manipulative activities within his right hand. Mr. Royal does have reduced right grip effort secondary to his shoulder problem but he does maintain the ability to grip objects with his right hand. It is because Mr. Royal has full and normal range of motion and function within his right elbow as well as normal sensation and coordination in his right hand, together with reduced grip effort, that he should not be considered to have lost all use of the right upper extremity for practical purposes. *Page 10 
 On a functional, day-to-day, basis, Mr. Royal is able to perform manipulative activities with his hands on his lap. Such activities would not involve lifting heavy weights but certainly, he is able to manipulate objects with his hands. Specifically, while sitting in a chair with a clipboard on his lap he would be able to use his right hand to check off objects or to write lists. Such actions do no require movement of the shoulder.
 {¶ 18} 11. Following a September 14, 2005 hearing, a district hearing officer ("DHO") issued an order granting claimant's motion. The DHO's order explains:
 In accordance with ORC 4123.57(B) and the decision of State ex rel. Alcoa Building Products vs. Industrial Com-mission, District Hearing Officer finds that the injured worker has proved by a preponderance of the evidence that he has suffered a total loss of use of his "RIGHT UPPER EXTREMITY" which is causally related to the industrial accident suffered by injured worker on 11/04/1988.
 District Hearing Officer bases this decision on the 02/19/1997 medical report by Dr. Rutherford which de-monstrates that injured worker has suffered a permanent loss of use of his right upper extremity that for all practical intents and purposes equates functionally to an amputation of this entire body part. District Hearing Officer also relies on injured worker's testimony at hearing which supports the medical opinion of Dr. Rutherford in that: 1) injured worker's ongoing right upper extremity problems prohibit him from lifting or manipulating anything with his right hand or elbow heavier than a pencil or pack of cigarettes, 2) injured worker cannot lift his right upper extremity above his head or out to his side to perform functions and 3) injured worker was right hand dominant prior to the 11/04/1998 [sic] accident and as a result of the 11/04/1988 accident has had to teach himself to perform all functions of daily life by using only his left upper extremity.
 Therefore, based on the foregoing, District Hearing Officer orders that injured worker is entitled to receive a schedule loss/loss of use award in accordance with ORC 4123.57(B) for a period of two-hundred and twenty-five (225) weeks as outlined by statute.
(Emphasis sic.) *Page 11 
 {¶ 19} 12. Relator administratively appealed the DHO's order of September 14, 2005.
 {¶ 20} 13. Following a November 15, 2005 hearing, an SHO issued an order stating:
 The order of the District Hearing Officer, from the hearing dated 09/14/2005, is AFFIRMED. Therefore, the C-86, filed 06/28/2005, is GRANTED TO THE EXTENT OF THIS ORDER[.]
 The Staff Hearing Officer awards a scheduled loss of use award for the total right arm per R.C. 4123.57(B). This claimant is awarded 225 weeks of compensation as of 02/06/1997, date of Dr. Rutherford's report. The Staff Hearing Officer relies on the 02/19/1997 report of Dr. Ward, the 02/06/1997 report of Dr. Rutherford, and State ex rel. Alcoa Building vs. Industrial Commission (2004) 102 Ohio St.3d 341. The Staff Hearing Officer finds the allowed conditions resulted in 8 shoulder surgeries [which] eventually led to the functional total loss of use of the right arm.
(Emphasis sic.)
 {¶ 21} 14. On December 10, 2005, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of November 15, 2005.
 {¶ 22} 15. On January 12, 2006, relator, Wheeling-Pittsburgh Steel Corp., filed this mandamus action.
Conclusions of Law:
 {¶ 23} Two issues are presented: (1) whether the commission failed to apply the correct legal standard in determining that claimant has sustained the loss of use of his right arm, and (2) whether the commission relied upon some evidence supporting its finding of right arm loss of use. *Page 12 
 {¶ 24} The magistrate finds: (1) the commission applied the correct legal standard, and (2) the commission relied upon some evidence supporting its finding of right arm loss of use.
 {¶ 25} Accordingly, as more fully explained below, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
 {¶ 26} In State ex rel. Alcoa Bldg. Products v. Indus. Comm.,102 Ohio St.3d 341, 2004-Ohio-3166, at ¶ 10, the court succinctly set forth the historical development of scheduled awards for loss of use under R.C.4123.57(B). The Alcoa court states:
 Scheduled awards pursuant to R.C. 4123.57(B) compensate for the "loss" of a body member and were originally confined to amputations, with the obvious exceptions of hearing and sight. In the 1970's, two cases — State ex rel. Gassmann v. Indus. Comm. (1975), 41 Ohio St.2d 64, * * * and State ex rel. Walker v. Indus. Comm. (1979), 58 Ohio St.2d 402, * * * — construed "loss," as similarly used in R.C. 4123.58, to include loss of use without severance. Gassmann and Walker both involved paraplegics. In sustaining each of their scheduled loss awards, we reasoned that "[f]or all practical purposes, relator has lost his legs to the same effect and extent as if they had been amputated or otherwise physically removed." Gassmann, 41 Ohio St.2d at 67 * * *; Walker, 58 Ohio St.2d at 403-404[.] * * *
 {¶ 27} In Alcoa, the claimant sustained a left arm amputation just below the elbow. Continuing hypersensitivity at the amputation site prevented the claimant from ever wearing a prosthesis. Consequently, the claimant moved for a scheduled-loss award for loss of use of his left arm.
 {¶ 28} Alcoa established through a videotape that the claimant could use his remaining left arm to push open a car door and to tuck paper under the arm. *Page 13 
Nevertheless, the commission granted the claimant an award for the loss of use of his left arm.
 {¶ 29} This court denied Alcoa's complaint for a writ of mandamus and Alcoa appealed as of right to the Supreme Court of Ohio.
 {¶ 30} Affirming this court's judgment and upholding the commission's award, the Alcoa court explained, at ¶ 10-15:
 * * * Alcoa urges the most literal interpretation of this rationale and argues that because claimant's arm possesses some residual utility, the standard has not been met. The court of appeals, on the other hand, focused on the opening four words, "for all practical purposes." Using this interpretation, the court of appeals found that some evidence supported the commission's award and upheld it. For the reasons to follow, we affirm that judgment.
 Alcoa's interpretation is unworkable because it is impossible to satisfy. Walker and Gassmann are unequivocal in their desire to extend scheduled loss benefits beyond amputation, yet under Alcoa's interpretation, neither of those claimants would have prevailed. As the court of appeals observed, the ability to use lifeless legs as a lap upon which to rest a book is a function unavailable to one who has had both legs removed, and under an absolute equivalency standard would preclude an award. And this will always be the case in a nonseverance situation. If nothing else, the presence of an otherwise useless limb still acts as a counterweight — and hence an aid to balance — that an amputee lacks. Alcoa's interpretation would foreclose benefits to the claimant who can raise a mangled arm sufficiently to gesture or point. It would preclude an award to someone with the hand strength to hold a pack of cards or a can of soda, and it would bar — as here — scheduled loss compensation to one with a limb segment of sufficient length to push a car door or tuck a newspaper. Surely, this could not have been the intent of the General Assembly in promulgating R.C. 4123.57(B) or of Gassmann and Walker.
 Pennsylvania defines "loss of use" much as the court of appeals did in the present case, and the observations of its *Page 14 
judiciary assist use here. In that state, a scheduled loss award requires the claimant to demonstrate either that the specific bodily member was amputated or that the claimant suffered the permanent loss of use of the injured bodily member for all practical intents and purposes. Discussing that standard, one court has written:
 "Generally, the `all practical intents and purpose' test requires a more crippling injury than the `industrial use' test in order to bring the case under section 306(c), supra. However, it is not necessary that the injured member of the claimant be of absolutely no use in order for him to have lost the use of it for all practical intents and purposes." Curran v. Walter E. Knipe Sons, Inc. (1958), 185 Pa.Super. 540, 547, 138 A.2d 251.
 This approach is preferable to Alcoa's absolute equivalency standard. Having so concluded, we further find that some evidence indeed supports the commission's decision. Again, Dr. Perkins stated:
 "It is my belief that given the claimant's residual hyper-sensitivity, pain, and tenderness about his left distal forearm, that he is unable to use his left upper limb at all and he should be awarded for the loss of use of the entire left upper limb given his symptoms. He has been given in the past loss of use of the hand, but really he is unable to use a prosthesis since he has had the amputation, so virtually he is without the use of his left upper limb * * *."
 {¶ 31} Relying upon Alcoa, this court, in [State ex rel.] Richardsonv. Indus. Comm., Franklin App. No. 04AP-724, 2005-Ohio-2388, explained the standard that Alcoa clarified:
 * * * [W]hen a claimant seeks a scheduled loss award, the proper inquiry is whether, taking into account both medical findings and real functional capacity, the body part for which the scheduled loss award is sought is, for all practical purposes, unusable to the same extent as if it had been amputated or otherwise physically removed. * * *
Id. at ¶ 7. *Page 15 
 {¶ 32} In this action, relator claims that the SHO applied a so-called "functional loss of use" standard rather than the standard set forth inAlcoa. (Relator's brief at 8.) The magistrate disagrees with relator's claim that this court should conclude that the SHO substituted her own legal standard.
 {¶ 33} Both the order of the DHO and SHO cite to Alcoa. The presumption is that the hearing officers read Alcoa and understood its import since they cited Alcoa for the standard they applied. In the magistrate's view, relator is asking this court to speculate that the SHO used her own legal standard simply because she concluded in her own words that there is "functional" loss of use. Moreover, functional loss of use of a body part does not necessarily imply less loss of function than a loss of use for all practical purposes or to the same extent as if it had been amputated or otherwise physically removed.
 {¶ 34} Thus, the magistrate finds that relator has failed to show that the commission applied an incorrect legal standard.
 {¶ 35} The second issue is whether the commission relied upon some evidence supporting its finding of right arm loss of use.
 {¶ 36} Accusing the commission of "ignoring" the one medical report authored within the last eight years, relator asks this court to favorably view Dr. Steiman's report. According to relator, Dr. Steiman's findings are undisputed. (Relator's brief at 11.) Dr. Steiman wrote:
 On a functional, day-to-day, basis, Mr. Royal is able to perform manipulative activities with his hands on his lap. Such activities would not involve lifting heavy weights but certainly, he is able to manipulate objects with his hands. Specifically, *Page 16 
while sitting in a chair with a clipboard on his lap he would be able to use his right hand to check off objects or to write lists. Such actions do no require movement of the shoulder.
 {¶ 37} The commission, however, did not rely upon Dr. Steiman's report nor was the commission required to do so. Moreover, Dr. Steiman's findings are not undisputed, as relator claims here.
 {¶ 38} Dr. Rutherford wrote: "Since he uses an abduction pillow under his right upper extremity almost all the time when he's up and about his right hand and elbow would not be in a position for functional use."
 {¶ 39} Clearly, Dr. Rutherford's findings regarding claimant's ability to use his right hand and elbow differ from Dr. Steiman's findings.
 {¶ 40} Dr. Ward's findings also differ with those of Dr. Steiman. Again, Dr. Ward wrote: "At the present time he has to wear a bolster type splint to hold his right shoulder fixed in about 20 degrees of abduction. He effectively has lost the use of his right upper extremity. Any attempt at motion of the shoulder causes a severe pain."
 {¶ 41} Dr. Ward refers to a "bolster type splint" and Dr. Rutherford refers to a "abduction pillow" that impacts claimant's ability to use his right hand. Dr. Steiman's report does not address those devices.
 {¶ 42} It is the commission that weighs the evidence. It was within the commission's fact-finding discretion to reject Dr. Steiman's report and to accept the reports of Drs. Rutherford and Ward — reports that do indeed support a commission finding of a total loss of right arm use. *Page 17 
 {¶ 43} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus. *Page 1