DECISION IN MANDAMUS
{¶ 1} Relator, John Bradford, filed this original action requesting a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order denying his motion for an R.C.4123.57(B) scheduled-loss award for an alleged total loss of use of his left arm and to enter an order awarding compensation.
 {¶ 2} This court referred this matter to a magistrate pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, recommending that this court deny the requested writ. (Attached as Appendix A.) No objections to that decision have been filed.
 {¶ 3} Finding no error of law or other defect on the face of the magistrate's decision, this court adopts the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it. In accordance with the magistrate's decision, the requested writ is denied.
Writ of mandamus denied.
SADLER, P.J., and BROWN, J., concur.
 APPENDIX A MAGISTRATE'S DECISION IN MANDAMUS {¶ 4} In this original action, relator, John Bradford, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying his motion for an R.C.4123.57(B) scheduled-loss award for an alleged total loss of use of his left arm, and to enter an order awarding said compensation.
Findings of Fact:
 {¶ 5} 1. On May 22, 2001, relator sustained an industrial injury while employed as a "sheet cutter." On that date, his left arm was caught in the roller of a machine.
The industrial claim is allowed for:
 Crushing injury of left hand; crushing injury of left forearm; fracture left ulna shaft-closed; sprain left carpal; sprain left wrist; recurrent depressive psychosis — moderate; generalized anxiety disorder; joint contracture, left forearm; tear scapholunate ligament, left; plastic bowing, left radius; partial triangular fibrocartilage tear, left.
 {¶ 6} 2. On the date of injury, relator's injuries were evaluated at a hospital emergency room. X-rays disclosed an ulnar shaft fracture.
 {¶ 7} 3. On May 25, 2001, relator was examined for purposes of treatment by orthopedic surgeon James E. McQuillan, M.D. In his office note of that date, Dr. McQuillan wrote:
 PHYSICAL EXAMINATION: The patient's examination today shows no pain to palpation around the elbow or shoulder. His wrist is tender. His radial, ulnar and median nerve are intact. Radial and ulnar pulse are strong and swelling is minimal. There is some prominence of the forearm dorsally.
 X-RAYS: Radiographs show an apex dorsal but minimally displaced fracture of the ulnar shaft.
 IMPRESSION: Fracture of the ulna with possible plastic deformation of the radius.
 RECOMMENDATIONS: I have recommended placing the patient into a long arm cast for comfort. I would like to see him back in this office in about ten days and at that point the cast should be removed.
 IMPRESSION: Impression at this time is:
 1) Fracture left ulna.
 2) Plastic bowing of the radius.
 3) Crush injury left arm.
 4) Crush injury left hand.
 When John returns we will make decisions whether or not he would need surgical intervention.
 {¶ 8} 4. On June 8, 2001, relator underwent open reduction/internal fixation of the ulnar shaft fracture with hardware consisting of a plate and screws.
 {¶ 9} 5. Apparently, following the surgery, relator was referred to William McCue, M.D., who, on October 2, 2001, performed a manipulation of the left wrist and forearm under anesthesia and performed arthroscopy of the left wrist.
 {¶ 10} 6. During December 2001 and January 2002, relator was evaluated by Susan Tribuzi, who is a certified hand therapist. Her nine-page report is contained in the stipulated record. At page six of the report, Tribuzi wrote: "Patient reports that he is able to complete all self care activities."
 {¶ 11} 7. The record contains an office note from Dr. McCue dated January 31, 2002, stating:
 * * * John has been working in therapy with Sue Tribuzi. He has continued limited pro/supination of his left forearm and intermittent pain in the wrist and forearm. He has made slight improvement with the custom sugartong splint, which Sue fabricated for John previously. He still has marked limitation of pro/supination. He has been tested for his ability to grip and lift and it was found, by Sue, that he could lift approximately 23# with his forearms pronated and then reported pain, and 31 # with the forearm supinated.
 {¶ 12} 8. On May 14, 2003, Dr. McQuillan wrote:
 John H. Bradford is seen today for problems with his left forearm. He has a healed ulna fracture with what appears to be traumatic bowing of his radius and he has had marked limitation of motion. He complains of pain along the radial aspect of the radial shaft. He has some mild pain in his palm.
 He is noted to have nodularity in the palmar fascia to the middle or ring finger.
 His examination today reveals tenderness along the shaft of the radius. He has no improvement in pronation. Supination is somewhat limited and somewhat uncomfortable. Elbow motion, in terms of flexion-extension, full. Full motion of the ulnar three digits. The index finger is periodically stiff. Thumb motion is good. Mass is noted in palm.
 Radiographs obtained today including forearm demonstrate a healed ulnar fracture and no apparent disruption of the DRUJ.
 IMPRESSION: Painful forearm after fracture.
 {¶ 13} 9. On July 16, 2004, Dr. McQuillan wrote:
 It is my opinion that Mr[.] John Bradford, for all intents and purposes, has lost the functional use of his left upper extremity[.] He has a permanent supination contracture and is unable to pronate his forearm. This severely limits him in any sort of daily activity and certainly limits him to the point that I do not believe he is capable of finding a job that requires the use of both hands and arms.
 He has a permanent bowing deformity of the left radius, he has fractured his ulna[.] The ulna has been fixed with a plate and seven screws[.] His forearm rotation is minimal. He also has some loss of wrist motion[.] He has early development of contractures in the palm of his left hand. All of these conditions have limited his ability to functionally] use his left upper extremity[.]
 {¶ 14} 10. On July 30, 2004, citing Dr. McQuillan's July 16, 2004 report, relator moved for R.C. 4123.57(B) scheduled-loss compensation for the alleged loss of use of his left arm.
 {¶ 15} 11. On October 19, 2004, at the request of the Ohio Bureau of Workers' Compensation ("bureau"), relator was examined by Richard J. Reichert, M.D. In his report, dated November 4, 2004, Dr. Reichert states:
 Examination of the left elbow revealed tenderness overlying the medial epicondyle. He had no significant tenderness in the midforearm region. Range of motion measurements of the left elbow revealed flexion of 130 degrees, extension of 0 degrees, pronation of 15 degrees, and supination of 90 degrees.
 Examination of the left wrist revealed mild tenderness along the ulnar styloid area. His grip strength was measured with a Jamar dynamometer and measured 44 kg force on the right and 12 kg force on the left. This was consistent with rapid alternating grip measurements. The individual had pinch strength on the left of 4.5 kg force and 10.5 kg force on the right. Range of motion measurements of the left wrist revealed palmar flexion of 20 degrees, dorsiextension of 30 degrees, radial deviation of 10 degrees, and ulnar deviation of 20 degrees.
 Examination of the left shoulder revealed no tenderness to palpation. The individual was noted to have abduction of 90 degrees, flexion of 180 degrees, extension of 30 degrees, internal rotation of 70 degrees, and external rotation of 90 degrees.
 The left upper extremity was noted to be warm to touch, with a good vascular supply. He was noted to have nodules on the flexor tendons going to the third and fifth digits. These nodules were noted in the midpalmar area.
 * * *
 This individual certainly had a significant injury to his left upper extremity and hand. He does show evidence of decreased range of motion and decreased grip strength, however, I do not believe at this time that he has complete loss of use of that hand and arm. Rather, it is my opinion that he is capable of work within the restrictions of limited use of the left hand and arm and to avoid heavy grasping with the left arm. I do not believe that this gentleman's condition, however, qualifies for an award for loss of use, as he is able to use the arm but only in a limited fashion.
 {¶ 16} 12. On December 13, 2004, at relator's own request, he was examined by Dr. Ambrose S. Perduk, Jr., who is a chiropractor. In his report, dated December 20, 2004, Dr. Perduk wrote:
 It is my opinion based on my previous experiences with impairments that for all intents and purposes Mr[.] Bradford has lost functional use of his left hand/upper extremity. This opinion is based on his lack of strength, lack of mobility, lack of discrete sensation over the hand and fingers. It is also my opinion that Mr. Bradford has a loss of use for practical purposes. He is unable to hold even the smallest amount of weight for 30 seconds. This inability to hold a small amount of weight along with very pronounced limited motion/function does not provide any actual use for any practical purpose. It is also my opinion that once again for all intents and purposes he has suffered the loss of use of this arm for all practical purposes.
 {¶ 17} 13. The state-fund employer in this industrial claim requested that Paul C. Martin, M.D., review a videotape and issue a report. Dr. Martin's report, dated July 9, 2005, states:
 As requested I have reviewed the provided video tape illustrating an individual who has been identified as John Bradford. In this video tape, the individual identified as John Bradford is asked to perform various activities in an attempt to identify the residual function, if any, of his left arm.
 Review of the provided video tape reveals Mr. Bradford to utilize his left arm to pick up a pen, pick up a pill container, pick up a computer disc, and finally, pick up a glass of water, although was observed to perform these activities with some difficulty. He is also observed to have some limited active motion of the wrist, as well as having fairly good active flexion and extension motion at the level of the elbow.
 From review of the provided video tape, Mr. Bradford demonstrates the ability to utilize his left arm for certain limited functions, which does not in my opinion, equate to the loss of use of the extremity. Mr. Bradford clearly has some residual function with his left arm, which is greater than if the arm had been amputated or otherwise physically removed.
 As such, it is my medical opinion Mr. Bradford's observed left arm function does not support his request for loss of use of the left upper extremity.
 {¶ 18} 14. Following an April 5, 2005 hearing, a district hearing officer ("DHO") issued an order denying relator's motion for R.C.4123.57(B) scheduled-loss compensation. The DHO's order explains:
 The request for a scheduled loss award for total loss of the left upper extremity is denied.
 This order is based on the 11/04/2004 report of Dr. Reichert who indicates the Claimant has significant limitations, but has not sustained a total loss of use of the left upper extremity. This order is also based on the Claimant's testimony that he can pick up objects with difficulty, that he has no problem moving from the shoulder, that he can make a fist, can pinch the thumb and index finger, and who demonstrated his abilities at hearing by moving his fingers, raising his arm and flexing/extending at the elbow.
 {¶ 19} 15. Relator administratively appealed the DHO's order of April 5, 2005.
 {¶ 20} 16. Following a July 14, 2005 hearing, a staff hearing officer ("SHO") issued an order stating:
 The order of the District Hearing Officer, dated 04/05/2005, is affirmed. Therefore, the C-86, filed 07/30/2004, is denied.
 The Staff Hearing Officer finds that on 04/05/2005, an order was placed by the District Hearing Officer that found and concluded that claimant has not suffered a total loss of use of his left upper extremity/left arm as a result of this 05/22/2001 work injury.
 This Staff Hearing Officer, in affirming this order to deny the "LOSS OF USE" OF LEFT UPPER EXTREMITY/LEFT ARM award pursuant to Ohio Revised Code 4123.57(B), has reviewed and considered all relevant evidence, including the testimony and arguments presented at hearing this date.
 This Staff Hearing Officer finds that the conclusions reached by the District Hearing Officer are adequately supported and hereby accepts the District Hearing Officer's decision as her own.
 This Staff Hearing Officer has specifically relied upon the 11/04/2004 report of Dr. Reichert who indicates claimant has significant limitations, but not a total loss of use of the left upper extremity; the 07/09/2005 report of Dr. Martin who finds limited active motion of the left wrist and forearm, but claimant still utilizes the left arm for certain limited functions; the office notes of Dr. McQuillan which document the significant limitations in claimant's left wrist and forearm, however, normal function of the left elbow and shoulder; the 05/14/2003 office note of Dr. McQuillan which notes the marked limitations in claimant's forearm, however, full motion in claimant's left elbow, shoulder and digits on claimant's left hand; the 01/22/2002 Hand Therapy Evaluation which extensively evaluated claimant and found claimant able to complete all self care activities, able to grip and lift 23 pounds safely and perform other left upper arm functions; and, the 01/31/2002 office note of Dr. McCue who found claimant able to grip and lift albeit on a limited basis.
 {¶ 21} 17. On August 20, 2005, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of July 14, 2005.
 {¶ 22} 18. On February 8, 2006, relator, John Bradford, filed this mandamus action.
Conclusion of Law:
 {¶ 23} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 24} In State ex rel. Alcoa Bldg. Products v. Indus. Comm.,102 Ohio St.3d 341, 2004-Ohio-3166, at ¶ 10, the court succinctly set forth the historical development of scheduled awards for loss of use under R.C.4123.57(B). The Alcoa court states:
 Scheduled awards pursuant to R.C. 4123.57(B) compensate for the "loss" of a body member and were originally confined to amputations, with the obvious exceptions of hearing and sight. In the 1970's, two cases — State ex rel. Gassmann v. Indus. Comm. (1975), 41 Ohio St.2d 64, * * * and State ex rel. Walker v. Indus. Comm. (1979), 58 Ohio St.2d 402, * * * — construed "loss," as similarly used in R.C. 4123.58, to include loss of use without severance. Gassmann and Walker both involved paraplegics. In sustaining each of their scheduled loss awards, we reasoned that "[f]or all practical purposes, relator has lost his legs to the same effect and extent as if they had been amputated or otherwise physically removed." Gassmann, 41 Ohio St.2d at 67 * * *; Walker, 58 Ohio St.2d at 403-404[.] * * *
 {¶ 25} In Alcoa, the claimant sustained a left arm amputation just below the elbow. Continuing hypersensitivity at the amputation site prevented the claimant from ever wearing a prosthesis. Consequently, the claimant moved for a scheduled-loss award for loss of use of his left arm.
 {¶ 26} Alcoa established through a videotape that the claimant could use his remaining left arm to push open a car door and to tuck paper under the arm. Nevertheless, the commission granted the claimant an award for the loss of use of his left arm.
 {¶ 27} This court denied Alcoa's complaint for a writ of mandamus and Alcoa appealed as of right to the Supreme Court of Ohio.
 {¶ 28} Affirming this court's judgment and upholding the commission's award, the Alcoa court explained, at ¶ 10-15:
 * * * Alcoa urges the most literal interpretation of this rationale and argues that because claimant's arm possesses some residual utility, the standard has not been met. The court of appeals, on the other hand, focused on the opening four words, "for all practical purposes." Using this interpretation, the court of appeals found that some evidence supported the commission's award and upheld it. For the reasons to follow, we affirm that judgment.
 Alcoa's interpretation is unworkable because it is impossible to satisfy. Walker and Gassmann are unequivocal in their desire to extend scheduled loss benefits beyond amputation, yet under Alcoa's interpretation, neither of those claimants would have prevailed. As the court of appeals observed, the ability to use lifeless legs as a lap upon which to rest a book is a function unavailable to one who has had both legs removed, and under an absolute equivalency standard would preclude an award. And this will always be the case in a nonseverance situation. If nothing else, the presence of an otherwise useless limb still acts as a counterweight — and hence an aid to balance — that an amputee lacks. Alcoa's interpretation would foreclose benefits to the claimant who can raise a mangled arm sufficiently to gesture or point. It would preclude an award to someone with the hand strength to hold a pack of cards or a can of soda, and it would bar — as here — scheduled loss compensation to one with a limb segment of sufficient length to push a car door or tuck a newspaper. Surely, this could not have been the intent of the General Assembly in promulgating R.C. 4123.57(B) or of Gassmann and Walker.
 Pennsylvania defines "loss of use" much as the court of appeals did in the present case, and the observations of its judiciary assist use here. In that state, a scheduled loss award requires the claimant to demonstrate either that the specific bodily member was amputated or that the claimant suffered the permanent loss of use of the injured bodily member for all practical intents and purposes. Discussing that standard, one court has written:
 "Generally, the `all practical intents and purpose' test requires a more crippling injury than the `industrial use' test in order to bring the case under section 306(c), supra. However, it is not necessary that the injured member of the claimant be of absolutely no use in order for him to have lost the use of it for all practical intents and purposes." Curran v. Walter E. Knipe Sons, Inc. (1958), 185 Pa.Super. 540, 547, 138 A.2d 251.
 This approach is preferable to Alcoa's absolute equivalency standard. Having so concluded, we further find that some evidence indeed supports the commission's decision. Again, Dr. Perkins stated:
 "It is my belief that given the claimant's residual hyper-sensitivity, pain, and tenderness about his left distal forearm, that he is unable to use his left upper limb at all and he should be awarded for the loss of use of the entire left upper limb given his symptoms. He has been given in the past loss of use of the hand, but really he is unable to use a prosthesis since he has had the amputation, so virtually he is without the use of his left upper limb * * *."
 {¶ 29} Relying upon Alcoa, this court, in [State ex rel.] Richardsonv. Indus. Comm., Franklin App. No. 04AP-724, 2005-Ohio-2388, explained the standard that Alcoa clarified:
 * * * [W]hen a claimant seeks a scheduled loss award, the proper inquiry is whether, taking into account both medical findings and real functional capacity, the body part for which the scheduled loss award is sought is, for all practical purposes, unusable to the same extent as if it had been amputated or otherwise physically removed. * * *
Id. at ¶ 7.
 {¶ 30} Here, relator suggests that the Alcoa court abandoned a standard which relator describes as the "as if amputated" standard in favor of a new standard which relator describes as the "loss of functional use for practical intents and purposes" standard. (Relator's brief at 5.) (Reply brief.)
 {¶ 31} The magistrate disagrees with relator's analysis of Alcoa.Alcoa did not abandon a standard for a new one. While the Supreme Court of Ohio, in Alcoa, did reject the "absolute equivalency" standard proposed by the employer, "absolute equivalency" had never been the law in scheduled-loss cases since State ex rel. Gassmann v. Indus.Comm. (1975), 41 Ohio St.2d 64, and State ex rel. Walker v. Indus.Comm. (1979), 58 Ohio St.2d 402. The Alcoa court, however, did clarify the Walker and Gassman standard.
 {¶ 32} The magistrate notes that, just one month prior to theAlcoa decision, the Supreme Court of Ohio stated in State ex rel.Timmerman Truss, Inc. v. Indus. Comm., 102 Ohio St.3d 244,2004-Ohio-2589, at ¶ 21, as follows:
 Scheduled loss awards under R.C. 4123.57(B) (formerly R.C. 4123.57[C] ) were originally confined to amputees. See State ex rel. Bohan v. Indus. Comm. (1946), 146 Ohio St. 618, 33 O.O. 92, 67 N.E.2d 536, paragraph two of the syllabus, citing former G.C. 1465-80. Now, however, these awards include total loss of use without severance where the loss is "to the same effect and extent as if [the body part] had been amputated or otherwise physically removed." Walker, 58 Ohio St.2d at 403, 12 O.O.3d 347, 390 N.E.2d 1190.
 {¶ 33} Clearly, nothing in the Alcoa decision indicates thatTimmerman Truss, Inc., is overruled, thus further indicating that theAlcoa court did not abandon a standard for a new one.
 {¶ 34} The SHO's order of July 14, 2005, states reliance upon six medical documents:
 1. Dr. Reichert's November 4, 2004 report.
 2. Dr. Martin's July 9, 2005 report.
 3. Dr. McQuillan's office notes.
 4. Dr. McQuillan's May 14, 2003 office note.
 5. The January 22, 2002 hand therapy evaluation.
 6. Dr. McCue's January 31, 2002 office note.
 {¶ 35} The reports from Drs. Reichert and Martin were prompted by relator's claim of left arm loss of use. The remaining reports relied upon were not prompted by relator's claim of left arm loss of use.
 {¶ 36} The relied upon reports of Drs. Reichert and Martin contain opinions on the ultimate issue of left arm loss of use. The remaining reports relied upon do not contain opinions on the ultimate issue.
 {¶ 37} The remaining reports (other than those from Drs. Reichert and Martin) were cited by the SHO to lend additional support to the decision. Those remaining reports were cited to support the SHO's findings that relator retains significant use of his left elbow, left shoulder and the digits of his left hand.
 {¶ 38} While relator in this action and the claimant in Alcoa both claim a left arm loss of use, relator's medical situation is significantly different than the claimant in Alcoa. In Alcoa, the claimant sustained a left arm amputation just below the elbow. By contrast, relator has sustained no amputation and retains significant use of his left elbow and left hand.
 {¶ 39} As the commission points out in this action, in the context of R.C. 4123.57(B), an arm includes the hand of that arm. See State ex rel.Cook v. Zimpher (1985), 17 Ohio St.3d 236 (scheduled-loss awards are cumulative). Thus, relator cannot obtain compensation for loss of use of his left arm by ignoring the functionality of his left hand and left elbow.
 {¶ 40} Relator supported his motion for left arm loss of use with the July 16, 2004 report of Dr. McQuillan. Dr. McQuillan opined that relator has lost the functional use of his left upper extremity. His opinion is premised in large part by his finding that relator has a "permanent supination contracture and is unable to pronate his forearm." Dr. McQuillan also notes that "forearm rotation is minimal" and that there is "some loss of wrist motion."
 {¶ 41} Dr. McQuillan addresses the left hand in a single sentence: "He has early development of contractures in the palm of his left hand." There is no mention in Dr. McQuillan's report of the range of motion of the digits of the left hand. There is no mention of the range of motion in the left elbow.
 {¶ 42} Dr. Reichert's report is clearly some evidence upon which the commission can rely. Dr. Reichert appropriately included an evaluation of the functionality of the left hand. While Dr. Reichert does not mention the standard to be applied for loss of use, this court can readily determine from the report that Dr. Reichert's findings from his examination do not support loss of use of the left arm under theAlcoa standard.
 {¶ 43} Dr. Martin reviewed a videotape provided by the employer. Dr. Martin observed that with his left arm (and presumably his left hand), relator can "pick up a pen, pick up a pill container, pick up a computer disc, and finally, pick up a glass of water, although was observed to perform these activities with some difficulty."
 {¶ 44} Dr. Martin also observed "some limited active motion of the wrist, as well as having fairly good active flexion and extension motion at the level of the elbow." Based upon those observations, Dr. Martin concluded that relator "has some residual function with his left arm, which is greater than if the arm had been amputated or otherwise physically removed."
 {¶ 45} There is no evidence in Dr. Martin's report that he applied the "absolute equivalency" standard rejected by the Alcoa court. Read in its entirety, Dr. Martin's report indicates that he applied the correct standard set forth in Timmerman Truss, Inc., and Alcoa.
 {¶ 46} Relator suggests that the SHO relied upon outdated medical records. Relator points out that the relied upon office notes from Dr. McQuillan predate his July 16, 2004 report that was submitted in support of the motion for scheduled-loss compensation. Dr. McCue's office note and the hand therapy evaluation also predate the July 16, 2004 report of Dr. McQuillan.
 {¶ 47} There is no evidence in the record indicating that Dr. McQuillan's office notes, Dr. McCue's office note, or the hand therapy evaluation were outdated for the purpose for which they were cited by the SHO — to show significant functionality in the left elbow and left hand.
 {¶ 48} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.