[Cite as *State ex rel. Waite v. Indus. Comm.*, 2016-Ohio-8496.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. Sandra Waite, | : | |
| Relator, | : | |
| v. | : | No. 15AP-1018 |
| The Industrial Commission of Ohio and | : | (REGULAR CALENDAR) |
| KeyBank National Assoc., | : | |
| Respondents. | : | |

D E C I S I O N

Rendered on December 29, 2016

*Shapiro, Marnecheck & Palnik, Matthew A. Palnick*, and *Elizabeth M. Laporte*, for relator.

*Michael DeWine*, Attorney General, and *Kevin J. Reis*, for respondent Industrial Commission of Ohio.

*Littler Mendelson, P.C., Michael T. Short*, and *Marisa Bartlette Willis*, for respondent KeyBank National Association.

IN MANDAMUS
ON OBJECTION TO THE MAGISTRATE'S DECISION

SADLER, J.

{¶ 1} Relator, Sandra Waite, commenced this original action requesting a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its decision denying her application for total loss of use of her left leg and ordering the commission to grant her application for such compensation.

{¶ 2}   Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued the appended decision, including findings of fact and conclusions of law.  The magistrate determined that the commission's finding was supported by some evidence in the record and, as a result, recommended that this court deny the requested writ of mandamus.  For the following reasons, we overrule the objection and deny the requested writ.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 3}   None of the parties have filed objections to the magistrate's findings of fact, and following an independent review of the record, we adopt those findings as our own.  As more fully set forth in the magistrate's decision, relator sustained a work-related injury in February 2012, and her worker's compensation claim was allowed for several conditions relating to a left ankle sprain and fracture.  Relator developed complex regional pain syndrome and a "pseudo-clubfoot deformity" that effectively rendered her unable to bear weight on that foot.  (Sept. 20, 2013 Report of Mark J. Mendeszoon, D.P.M.)  Under care of a podiatrist, Dr. Mendeszoon, relator underwent surgery and post-operative therapy in January 2014.

{¶ 4}   On March 2, 2015, relator filed an application for total functional loss of use of her left leg, supported by a February 25, 2015 report of Dr. Mendeszoon.  Within that report, Dr. Mendeszoon opined that relator will never be able to walk on her left leg again, and the best she can hope to achieve is to stand and pivot and possibly do some minimal activities for independent living.  He noted that relator wears special braces and shoes and expressed the strong possibility that relator would receive a below the knee amputation in the future.

{¶ 5}   Following a hearing, a district hearing officer ("DHO") issued an order awarding R.C. 4123.57(B) compensation for the loss of use of her left leg.  Respondent KeyBank appealed, and after another hearing, a staff hearing officer ("SHO") issued an order vacating the DHO's decision and denying relator's motion based on the independent medical examination of Paul C. Martin, M.D., dated May 4, 2015.  According to Dr. Martin's report, appellant retained use of her left leg for balance and ambulation.  Dr. Martin's examination referenced post-operative physical therapy notes, which documented relator's ability to go up and down stairs with a quad cane, independence

with mobility transfers, and the ability to stand greater than 30 minutes.  The SHO additionally relied on a surveillance video confirming relator's ability to ambulate with her quad cane independently.  Relator's further appeal was refused by the commission, and, thereafter, she filed the instant mandamus action in this court.

{¶ 6}   As previously indicated, the magistrate recommended that this court deny relator's request to issue the writ of mandamus.  In its decision, the magistrate first discussed the inconsistency of Dr. Mendeszoon's February 25, 2015 report with his office notes three days later recommending that relator transition into a walking shoe and lighter brace to allow comfortable ambulation. Next, the magistrate disagreed with relator's argument that Dr. Martin's report must be removed from evidentiary consideration because Dr. Martin allegedly was unaware that relator wore certain braces and that her left leg was significantly shorter than her right leg. In doing so, the magistrate emphasized that Dr. Martin reviewed medical records from Dr. Mendeszoon and that relator does not argue that Dr. Martin's report is equivocal, internally inconsistent, or applies an incorrect standard for determining loss of use.  As a result, the magistrate concluded that the May 4, 2014 report of Dr. Martin provides some evidence on which the commission could rely to support denial of relator's claim and that relator had not met her burden in proving the commission abused its discretion in rendering its decision.

## II. OBJECTION

{¶ 7}   Relator assigns the following objection to the magistrate's decision:

> The Magistrate erred in finding the Industrial Commission did not abuse its discretion in relying upon Dr. Martin's report to deny Relator's application for total loss of use of her left leg as said report is not "some evidence" as a matter of law as it fails to take into account all of the numerous assistive devices Relator requires in order to allow her to take the limited steps she has taken during physical therapy and Dr. Martin's exam.

## III. DISCUSSION

{¶ 8}   Relator's objection is, in essence, the same arguments made to and addressed by the magistrate.  Contrary to relator's position, in his analysis, the magistrate expressly took into account relator's arguments regarding her reliance on braces to walk

as well as her shorter left leg. After an independent review of the record and with consideration of relator's objection, we conclude that the magistrate correctly reasoned that Dr. Martin's report and the surveillance video were some evidence to support the commission's denial of a total loss of use award. Dr. Martin's report and the surveillance video establish relator's ability to ambulate with the assistance of braces, a custom made shoe, and a cane. This evidence satisfies the legal standard established in *State ex rel. Richardson v. Indus. Comm.*, 10th Dist. No. 04AP-724, 2005-Ohio-2388, and *State ex rel. Bushatz v. Indus. Comm.*, 10th Dist. No. 10AP-541, 2011-Ohio-2613, for total loss of use awards, pursuant to R.C. 4123.57(B), in the context of functional capacity to ambulate through the use of correctives devices. *Richardson* at ¶ 6-10 (holding that the commission did not abuse its discretion in finding relator had not sustained a total loss of use, pursuant to R.C. 4123.57(B), where some evidence established relator's ability to walk with the assistance of a brace); *Bushatz* at ¶ 2, 4 (holding that commission properly applied the law and did not abuse its discretion by refusing to evaluate relator's loss of use without consideration of the correction provided by the foot brace); *State ex rel. Richardson v. Indus. Comm.*, 10th Dist. No. 11AP-678, 2012-Ohio-5660, ¶ 11; *State ex rel. Wike v. Suiza Dairy Group, LLC*, 10th Dist. No. 14AP-213, 2015-Ohio-681, ¶ 3, 44.

{¶ 9} Therefore, for the reasons set forth in the magistrate's analysis, we overrule relator's objection. *State ex rel. Schottenstein Stores Corp. v. Indus. Comm.*, 10th Dist. No. 07AP-1066, 2009-Ohio-2142, ¶ 4-5.

## IV. CONCLUSION

{¶ 10} Following review of the magistrate's decision, an independent review of the record, and due consideration of relator's objection, we find the magistrate properly determined the facts and applied the appropriate law. Therefore, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law. In accordance with the magistrate's decision, the requested writ of mandamus is denied.

*Objection overruled;*
*writ of mandamus denied.*

DORRIAN, P.J., and BRUNNER, J., concur.

_____

# A P P E N D I X

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. Sandra Waite, | : | |
| Relator, | : | |
| v. | : | No. 15AP-1018 |
| The Industrial Commission of Ohio and | : | (REGULAR CALENDAR) |
| KeyBank National Assoc., | : | |
| Respondents. | : | |

## M A G I S T R A T E ' S   D E C I S I O N

### Rendered on July 20, 2016

*Shapiro, Marnecheck & Palnik, Matthew A. Palnick,* and *Elizabeth M. Laporte,* for relator.

*Michael DeWine,* Attorney General, and *Kevin J. Reis,* for respondent Industrial Commission of Ohio.

*Littler Mendelson, P.C., Michael T. Short,* and *Marisa Bartlette Willis,* for respondent KeyBank National Assoc.

## IN MANDAMUS

{¶ 10} In this original action, relator, Sandra Waite, requests a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate the July 27, 2015 order of its staff hearing officer ("SHO") that denies relator's March 2, 2015 motion for an R.C. 4123.57(B) scheduled loss award for the alleged loss of use of her left leg, and to enter an order granting the award.

**Findings of Fact:**

{¶ 11} 1. On February 2, 2012, relator sustained an industrial injury while employed as an account manager for respondent, KeyBank N.A., a self-insured employer under Ohio's workers' compensation laws.  On that date, relator tripped over a telephone cord and fell.

{¶ 12} 2. Initially, relator went to an urgent care center where her left foot and ankle were x-rayed.

{¶ 13} 3. On February 22, 2012, relator did a follow-up with Gregory C. Sarkisian, D.O., who wrote:  "Impression: Probable ankle sprain versus occult fracture, left foot and ankle."

{¶ 14} 4. On March 6, 2012, relator first saw podiatrist Mark J. Mendeszoon, D.P.M.

{¶ 15} 5.  On March 7, 2012, at the request of Dr. Mendeszoon, relator underwent an MRI of her left ankle.  In his report, radiologist Vjekoslav Jeras, M.D. wrote:

> IMPRESSION:
>
> [One] Nondisplaced fracture through the anterior process of the calcaneus at the attachment of the bifurcate ligament with reactive marrow edema and small calcaneocuboid joint effusion. There is reactive soft tissue edema in the extensor digitorum brevis muscle.
>
> [Two] Stress Edema along the lateral margin head of the talus without discrete fracture. There are findings related to component of subtalar sprain.

{¶ 16} 6. On March 20, 2012, relator again saw Dr. Mendeszoon.  In his office note, Dr. Mendeszoon wrote:

> Radiographs: I reviewed the MRI report, but I am highly suspicious for chronic regional pain syndrome.
>
> Plan: It is my recommendation that she see Dr. Dean Pahr at Lake Hospital Pain Management for I believe that she needs pain management, sympathetic blocks and to treat this condition. Because it is early, hopefully, we can catch this. She needs to start range of motion and physical therapy to try to keep this from becoming a full-blown chronic regional pain syndrome. She understands this. We will try her on

Vicodin to help diminish the pain. Her husband was advised to do active range of motion. She is allowed to weight bear to touchdown to tolerance with her splint. If she has any problems, she will call. She will see Dr. Pahr as soon as possible.

Additional Diagnoses:

[One] Fracture and sprain of midfoot, 845.10.
[Two] Sprain of the ankle, 845.00.
[Three] Calcaneal fracture, 825.0.
[Four] 337.22, reflex sympathetic dystrophy/chronic regional pain syndrome.

{¶ 17} 7. By letter dated July 26, 2012, KeyBank certified the industrial claim (No. 12-813799) for the following conditions:

845.00 Left Ankle Sprain
845.10 Left Mid Foot Fracture and Sprain
825.0 Left Calcaneal Fracture
337.22 Chronic Pain Syndrome

{¶ 18} 8. In March 2013, Dr. Mendeszoon completed a C-9 request for surgery.

{¶ 19} 9. On September 20, 2013, Dr. Mendeszoon wrote to KeyBank's counsel:

As you know, this has been a tragic case from the initial injury. The patient sustained an ankle sprain and when she came to my office several years ago, she was immediately diagnosed with reflex sympathetic dystrophy or complex regional pain syndrome. Immediately, I put the request in for treatment for this condition for pain management consult, sympathetic blocks and physical therapy and there was a little delay in these events.

* * *

However, due to this neurological issue and her inability to walk, her foot has developed a pseudo-clubfoot deformity in which she is unable to weight bear whatsoever. Her foot is in an inverted, turned-in position. She has contractures of her digits and her Achilles tendon and bracing, which we have tried extensively, has failed. My concern is that if she continues to brace, she will start rubbing the outside bone of her fifth metatarsal or fibula, which will eventually cause ulcerations. The patient is at risk for below-knee amputation.

At this point, it is my medical opinion that Sandra would benefit from a pantalar arthrodesis which will fuse the ankle and hindfoot in a neutral position, keeping her at 90°. This will prevent her from further inverting or turning the foot in, causing her inability to walk. In addition, because of the muscle imbalances from the neurological condition of chronic regional pain syndrome, I would also recommend fusing digits 2, 3, 4 and 5. It is noted that medical treatment of any neurological case would benefit from arthrodesis. Anything short of an arthrodesis would not be acceptable.

I believe if we achieve the fusion of her foot and digits, it will allow her to have a plantigrade foot to put pressure down evenly and try to give her a stable foot and ankle, which will allow her the ability to improve her walking.

Once again, I understand that the chronic pain that she has will not go away with the surgery, but it may improve her ability for independence to ambulate. Please note, the patient is at risk for below-knee amputation and we would like to avoid this at all cost. This has been discussed with the patient.

{¶ 20} 10. Following an October 9, 2013 hearing, a district hearing officer ("DHO") issued an order granting the C-9 request for surgery.

{¶ 21} 11. KeyBank administratively appealed the DHO's order of October 9, 2013.

{¶ 22} 12. Following a November 18, 2013 hearing, an SHO issued an order affirming the DHO's order of October 9, 2013. The SHO's order explains:

Authorization is GRANTED for pantalar arthrodesis and hammertoe arthrodesis, as requested by Dr. Mendeszoon, within Bureau of Workers' Compensation/Industrial Commission of Ohio/Managed Care Organization rules, regulations, and guidelines. This is an attempt to reduce pain; stabilize the foot; improve the ability to walk; eliminate the need for a brace and to help reduce or prevent the possible risk for a below the knee amputation because of the positioning of the foot from this injury.

This is based upon the reports of: Dr. Mendeszoon, dated 03/14/2013, 07/31/2013 and 09/20/2013. This order is also based upon the credible testimony of the injured worker as noted herein, which the Hearing Officer finds persuasive.

(Emphasis sic.)

{¶ 23} 13. On January 21, 2014, relator underwent surgery performed by Dr. Mendeszoon. In his three-page operative report, Dr. Mendeszoon describes the surgical procedures performed:

> [One] Left pantelar arthrodesis.
> [Two] Left Steindler stripping of the planter musculature, plantar fascia.
> [Three] Left flexor tenotomies 2, 3, 4, and 5.

{¶ 24} 14. On May 13, 2014, relator began post-operative physical therapy at a frequency of twice per week at NovaCare Rehabilitation.

{¶ 25} 15. The NovaCare "Daily Note" regarding relator's February 9, 2015 visit, states:

> **Subjective Examination**
>
> * * *
>
> - Climbing             She reports ability to go up/down 10 carpeted stairs inside with quad cane, supervision by husband
> - Mobility/Transfers  Independent, requires more time
>
> * * *
>
> **Daily Comments:**
>
> - Sandra reports that she has been able to "take a few steps" without using her cane "but has it nearby in case I lose my balance." She reports losing her balance while walking with cane in kitchen and hitting her hand off cabinet sometime last week. She states that she has been able to go up 10 steps (carpeted) inside and then back down; at night she can go up all 15 as long as she is not coming right back down; "needs a break." She reports that she sees pain management doctor tomorrow.

{¶ 26} 16. On April 3, 2015, after some 11 months of therapy, NovaCare notes indicate:

> [Patient] with independence using quad cane in [physical therapy] clinic, in home with occasional use of crutches if

[patient] has increased pain, swelling of [left] foot. [Patient] reports now being able to go up/down inside stairs with cane (carpeted steps). [Patient] now progressed to 46 steps in [physical therapy] clinic without quad cane; gait antalgic due to lack of mobility of fixed [left] ankle joint.

{¶ 27} 17. On June 5, 2015, relator was discharged by NovaCare from her therapy. The discharge summary states:

[Patient] with independence using quad cane in [physical therapy], in home with occasional use of crutches if [patient] has increased pain, swelling of [left] foot. [Patient] reports now being able to go up/down inside stairs with cane (carpeted steps). [Patient] now progressed to 150+steps in [physical therapy] clinic without quad cane; gait antalgic due to lack of mobility of fixed [left] ankle joint (previously was 46 steps at last re-evaluation). Patient gaining independence with functional mobility with least restrictive AD.

{¶ 28} 18. Earlier, on February 28, 2015, Dr. Mendeszoon wrote:

**Exam:** Patient legs looks better today. She is scheduled for sympathetic blocks this week. Patient ankle and foot aren't very good position and the foot is warm with palpable pulses. She is able to wiggle her toes. Foot alignment looks very good. X-rays reveal hardware stable and there appears to be healing of the fusion sites.

At this time the bones even seem to be becoming more dense. She has stop[ped] smoking as well. The patient does have pain with her right shoulder and I believe she has a rotator cuff injury tendinitis. She has problems doing motions of the right shoulder and I believe this is from compensation of using crutches and cane to her last several years. I would like to see if we can get physical therapy or get a orthopedic evaluation of the shoulder.

Because the patient's brace is extremely heavy and she is very frail and weak I think we can now proceed with a new brace such as an Arizona brace. Her right she was weight tubing for right foot is causing for irritation or pre-ulcerations. [sic] These custom shoes do not fit her properly.

I believe we can progress the patient to a walking shoe regular shoes with an Arizona brace on left side. By getting her out of this double upright AFO and heavy shoe an

Arizona brace or regular sneaker should be extremely helpful and much more light weight issue allowed to ambulate more comfortably.

I believe that the patient will never go back to work. From my perspective from a surgical procedure I believe she is at maximal medical improvement however she still has a psychological issues [sic] and the depression and the chronic regional pain syndrome. This will always be ongoing.

Lastly the patient would benefit from a walk-in shower to make an adaption in her house so she doesn't fall by using her current situation.

{¶ 29} 19. On February 25, 2015, just three days prior to the February 28, 2015 office note, Dr. Mendeszoon wrote to relator's counsel:

I am writing to request that you add lower extremity limb disuse nonfunctional extremity to the above-referenced patient's claim.

As a physician who is familiar with the case, Sandra Waite has suffered the worst case of complex regional pain syndrome I have seen in my twenty-year career. She still struggles with continued pain, dysfunction and inability to walk and do any normal activities.

Sandra still requires special braces and shoes and continues to have periodic sympathetic blocks to manage her pain. She is approximately a year and a half out from pan talar arthrodesis of her foot and ankle. This procedure was to correct the severe pseudo-club foot deformity she developed from her advanced complex regional pain syndrome.

It is my medical opinion and expertise that this patient will never be able to walk on her left leg again. I believe the best she can hope for is to be able to stand and pivot and possibly do minimal activities to keep some form of living independently. It is also a strong possibility that Sandra may, in the future, receive a below knee amputation if her dysfunction, disability and pain are uncontrollable.

{¶ 30} 20. On March 2, 2015, citing the February 25, 2015 report of Dr. Mendeszoon, relator moved "that she be awarded a total functional Loss of Use of the left leg."

{¶ 31} 21. Relator's March 2, 2015 motion prompted a May 4, 2015 examination by Paul C. Martin, M.D. In his six-page narrative report, Dr. Martin states:

> On the date of injury, Ms. Waite stated she was employed as a team lead/collections. She reported on this particular date, she was sitting at her desk and when she got up, was unaware that her right leg was wrapped in a cord and she lost her balance and fell. She reported being initially seen at a local urgent care clinic and stated x-rays were obtained at that time. She was then referred to a podiatrist, Dr. Mendeszoon, who has continued to be her physician of record to this date. She reported that due to persistent difficulties with her foot, she was further evaluated with an MRI scan and afterwards stated she was casted for several weeks and then placed into a boot. She then reported being provided physical therapy over a several-month period of time; however, this resulted in no benefit. Ms. Waite stated she eventually underwent a fusion procedure involving her ankle and foot in January 2014, which was again followed by a course of physical therapy. She reported that she unfortunately developed a staph infection, which required an additional debridement procedure and also a PICC line for antibiotic treatment.
>
> Ms. Waite had also reported that she was identified as having complex regional pain syndrome, and has had several different sympathetic blocks provided by Dr. Pahr, who is a pain management physician. She reported that the blocks do help for a several week period of time and stated her last block was in April 2015. She reported Dr. Mendeszoon has currently recommended that she be provided a new brace which she stated will hopefully be much easier for her to utilize on her left leg. Ms. Waite stated that she had initially required usage of a walker and crutches for a several-month period of time and stated that since approximately December 2014, she has been utilizing and been instructed in usage of a quad cane. She reported that she began to develop some difficulties with her right shoulder stating she believes this is due to her reliance on her right arm especially when she leans on her right arm when utilizing crutches and the quad cane when she ambulates. She reported that she typically will utilize either crutches or a quad cane while at home. She reported having limited abilities to walk or stand, stating that she requires either usage of crutches or quad cane when she does so. She continues to experience

significant pain in the left lower leg along with occasional discoloration and recurrent swelling of the foot.

* * *

**PHYSICAL EXAMINATION:**
Physical examination revealed a well-developed, well-nourished female who arrived for today's examination in a wheelchair and stated this is much easier for her to get around when she has to walk for any period of time. She was accompanied by her husband who stayed in attendance during the entire evaluation process. Her height was found to be 64 1/2 inches, weight was 111 pounds, and blood pressure was 130/78.

Examination of the left leg revealed that Ms. Waite did appear with a brace on her leg which was removed for the purpose of today's examination. In examining the left leg from the knee distally, there was a moderate degree of muscle atrophy in a diffuse pattern. There was skin discoloration and some swelling over the ankle. There was allodynia primarily involving the distal third of the leg extending into the ankle and foot. No range of motion was possible at the ankle as this was previously fused. Ms. Waite exhibited some ability to flex and extend the toes of her foot. There were well-healed scars from the previous surgical procedure. There was a small area of redness over the dorsal portion of the foot which Ms. Waite reported was something she recently developed and for which she will be seeing her physician in the near future.

Ms. Waite was asked if she could ambulate during today's examination. She did so utilizing her quad cane, but did so in a fairly slow and measured manner utilizing her left leg for overall ambulation and balance.

* * *

**ASSESSMENT:**
Sandra Waite's stated history, physical examination findings, and review of the enclosed medical records and diagnostic study reports were all used as the sources of information and facts upon which my medical opinion and report were based.

According to the enclosed records, Ms. Waite's claim has been allowed for "left ankle sprain, left ankle midfoot

fracture and sprain, left calcaneal fracture, chronic regional pain syndrome, and major depression with single episode."

For the purpose of this examination, I have accepted all of the objective clinical findings identified by Ms. Waite's evaluating and treating physicians, but not necessarily their conclusions. All opinions offered in this report are held to a reasonable degree of medical certainty.

**[One] In your medical opinion, is there sufficient medical evidence to warrant a total functional loss of use of her left leg?**

Based upon my review of the provided medical records and Ms. Waite's symptoms and clinical findings, I do not identify sufficient medical evidence that would support total functional loss of use of the left leg. Ms. Waite is limited in her usage of her left leg; however, still utilizes the left leg for balance and ambulation. In addition, review of the recent physical therapy notes from February 9, 2015 reveals the following reported abilities "she reports ability to go up/down 10 carpeted stairs inside with quad cane, supervision by husband; is independent with mobility and transfers; reports being able to stand for 30 to 40 minutes and also is able to use a quad cane in her own kitchen and on carpet for 20 minutes at times."

It is my opinion Ms. Waite does exhibit certain residual functional use of her left leg, although is limited due to the current allowed conditions under this claim.

**[Two] Based solely on the allowed conditions of this claim, is any further treatment appropriate and necessary? If so, please provide a detailed treatment plan and duration that this treatment should be implemented.**

It is my medical opinion that treatment at this point in time would be considered treatment to help maintain a maximum level of benefit/improvement. Such treatment would include periodic usage of sympathetic blocks, should they continue to provide sufficient improvement with her condition, continuation of oral medications to help manage her symptoms and also be provided appropriate braces/ambulatory aids to help maintain a maximum level of

function. It is my medical opinion that such treatment will likely be necessary for the foreseeable future.

**[Three] Dr. Mendeszoon has continued to disable the claimant from work until an estimated date of May 23, 2015. In your medical opinion, is the claimant temporarily and totally disabled as directly related to the allowed condition of this claim, or [is] she capable of returning to work full duty or with restrictions? If restrictions are necessary for the claimant to work, please list specific restrictions and length of time that these restrictions should be implemented. Please also include whether these restrictions are temporary or permanent.**

It is my medical opinion as it relates to the allowed physical condition in this claim, Ms. Waite is not physically capable of returning to an unrestricted work environment. She is physically capable of working in a position where she would be allowed to sit the majority of the day with minimal walking or standing activities. It is my opinion restrictions would be considered permanent in nature, as her condition is not expected to improve nor resolve in the foreseeable future.

**[Four] In your medical opinion has the claimant reached maximum medical improvement for the allowed conditions of this claim? If the claimant is not yet MMI, when will this status be reached?**

Ms. Waite has, at this time, been provided all appropriate treatment modalities that would reasonably be expected to maximally improve and/or resolve the allowed physical conditions under this claim. At this time, it is my opinion Ms. Waite has experienced the maximum level of benefit from the treatment provided. Any additional treatment provided at this point in time would be considered treatment to help maintain a maximum level of benefit and not expected to result in any additional functional or physiologic improvement. As such, Ms. Waite has at this point reached a treatment plateau from which no additional functional or physiologic improvement can be expected to occur despite providing additional treatment or rehabilitative measures, and has reached maximum medical improvement for the allowed physical conditions under this claim.

(Emphasis sic.)

{¶ 32} 22. On May 4, 2015, at the request of KeyBank, a private investigator employed by Sedgwick conducted surveillance on relator's activities at her residence, and at the medical office of Dr. Martin.  The investigator obtained a video of relator's activities and he issued a six-page report.  The Sedgwick report states:

> <u>Monday, May 4, 2015</u>
>
> * * *
>
> **6:00 am**
> The TIG investigator commenced surveillance at the claimant's residence * * *. Stationary surveillance was established just east of the residence with a view of the front and driveway.
>
> **6:00 am - 8:28 am**
> No pertinent activity was observed. No one pertinent arrived or departed the area. No change or activity observed. Stationary surveillance was maintained.
>
> **8:29 am - 8:40 am (video)**
> The claimant was observed as she sat on a swing smoking a cigarette and drinking a beverage from a coffee cup using her right arm/hand on the front porch of the residence. An unidentified white male exited the residence carrying a coffee cup and joined her on the front porch. The claimant was observed slightly swinging and conversing with the male.
>
> * * *
>
> **8:51 am**
> The investigator departed the residence en route to the claimant's 10:30 am medical appointment at the office of Dr. Paul Martin * * *.
>
> **9:17 am**
> The investigator arrived at the address of the medical appointment * * *, departed the surveillance vehicle, entered the medical facility and assumed a seat in Dr. Martin's waiting room to await the claimant's arrival.
>
> * * *

**10:12 am**
The claimant and the previously-observed male entered Dr. Martin's office. The claimant was in a wheelchair and wheeled herself to the front window while the male assumed a seat in a chair. The claimant identified herself to the desk personnel as "Sandra Waite."

* * *

**10:13 am**
The investigator departed Dr. Martin's office and established stationary surveillance outside the medical facility overlooking two of three possible exits.

* * *

**12:15 pm**
With no pertinent activity observed, the investigator departed the area en route to the claimant's residence.

**12:33 pm**
The investigator arrived back at the claimant's residence * * *. Upon arrival, no vehicles were observed and no activity was noted. The investigator established a stationary surveillance position overlooking the residence.

* * *

**1:00 pm - 1:05 pm (video)**
The claimant was observed sitting, slightly swinging, in the front porch swing.

**1:06 pm (video)**
The claimant exited the swing, stood up with the cane in her right hand, picked up a can of soda with her left hand, walked into the residence, and closed the door going out of observation.

* * *

**1:23 pm - 1:28 pm (video)**
The claimant was observed again sitting, slightly swinging in the front porch swing. The claimant was wearing glasses and looking down towards her lap and talked on her cellular telephone while smoking. She held the telephone in her right

hand and was observed discarding a cigarette by reaching behind her and to the left with her left hand/arm.

1:29 pm - 1:31 pm (video)
The claimant was observed talking on her cellular phone using her right hand while sitting in the front porch swing. Vehicle 881YOX arrived at the claimant's residence, driver unobserved.

1:32 pm (video)
The claimant exited the porch swing, picked up the can of soda with her right hand and transferred it to her left hand, picked up her cane with her right hand, and walked toward the front door of the residence, holding the cellular phone up to her right ear with her right shoulder, entered the residence and closed the door, going out of observation.

{¶ 33} 23. Following a May 28, 2015 hearing, a DHO issued an order awarding R.C. 4123.57(B) scheduled loss compensation for loss of use of the left leg. The DHO relied upon the February 25, 2015 report of Dr. Mendeszoon, as well as relator's extensive testimony at the hearing. The DHO's order explains:

[T]he request for a scheduled loss/loss of use award is granted to the extent of this order.

As such, the District Hearing Officer orders that compensation for this request be paid in the normal and customary manner pursuant to R.C. 4123.57(B).

Counsel for the Injured Worker indicated there has been no prior permanent partial disability award in regard to this claim.

In support of this decision, the District Hearing Officer relies on the report of Mark Mendeszoon, D.P.M., dated 02/25/2015. Dr. Mendeszoon opined that the Injured Worker has suffered one of the worst cases of complex regional pain syndrome that he has seen in his career. He further noted she still struggles with continued pain, dysfunction and inability to walk and do any normal activities.

He further opined that the Injured Worker still requires special braces and shoes and continues to have periodic sympathetic blocks to manage her pain. Dr. Mendeszoon

concluded that the Injured Worker will never be able to walk on her left leg again. He opined that the best she can hope for is to be able to stand and pivot and possibly do minimal activities to keep some form of living independently. He further opined that it was a strong possibility that the Injured Worker may, in the future, receive a below knee amputation if her dysfunction, disability and pain are uncontrollable. As such, it was his recommendation that the Injured Worker has a non-functional left lower extremity limb disuse as a result of her industrial claim.

The Injured Worker presented at today's hearing in a wheelchair, wearing a brace on her left leg.

The Injured Worker was adamant in her testimony that she is unable to walk without anyone supporting her without use of a gait belt. The Injured Worker testified that she is absolutely unable to walk without some form of assistance. The Injured Worker testified that she has been in therapy for one year and in that time has made "slight improvement." The Injured Worker testified that she has not had any therapy since 04/30/2015 and to her knowledge, no additional therapy is being requested. In fact, the Injured Worker testified that the therapists have told her that [they] do not know what to do with her anymore as to future treatment.

The Injured Worker testified while in therapy, which is one hour in duration, she has two physical therapists, located on her left and right side. Both therapists hold the strap on the safety belt, for her balance. The Injured Worker testified that when she does walk in therapy, she wears her brace. The Injured Worker testified that she takes ten steps, takes a break and sits down for a period of 2-3 minutes, takes another ten minutes [sic], repeats the break, walks another ten steps, repeats the break and has testified that the most she has been able to walk is 46 steps. The Injured Worker testified the entire time this process is going on, the aides are holding the belts on each side of her, thereby assisting her with balance.

In her home, the Injured Worker testified that when she goes up the stairs in her home, she crawls on all fours and goes down the steps on her rear end. The Injured Worker testified that she cannot walk up the stairs in her home by holding a rail or with any use of an ambulatory device.

The Injured Worker denied that she is able to stand for any continuous amount of time, such as 30 to 40 minutes, which is outlined in the report of Paul Martin, M.D., dated 05/04/2015.

The Injured Worker testified that she is able to transfer from the wheelchair and can transfer into the shower. The Injured Worker testified that she cannot stand in the shower, but sits on a shower seat.

The Injured Worker testified that when she is utilizing her quad cane in her kitchen or on carpet, her husband is present and utilizing the safety belt on * * *.

The District Hearing Officer finds the evidence persuasive that the Injured Worker's left leg is functionally useless for all practical purposes and intents. The District Hearing Officer does not find that the Injured Worker has to demonstrate an absolute loss of function, but rather only a functional loss is required.

The District Hearing Officer finds that when taking into consideration a scheduled loss award, the proper inquiry is whether, taking into account both medical findings and real functional capacity, the body part for which the scheduled loss award is sought is, for all practical purposes, unusable to the same extent as if it had been amputated or otherwise physically removed.

The District Hearing Officer finds the Injured Worker has met her burden of proof as to this issue.

Therefore, the C-86 Motion is granted to the extent of this order.

The District Hearing Officer has reviewed and considered all evidence prior to rendering this decision. This order is based on the report of Dr. Mendeszoon, dated 02/25/2015, and evidence and arguments adduced at today's hearing, including the testimony of the Injured Worker.

{¶ 34} 24. KeyBank administratively appealed the DHO's order of May 28, 2015.

{¶ 35} 25. Following a July 27, 2015 hearing, an SHO issued an order that vacates the DHO's order of May 28, 2015, and denies relator's March 2, 2015 motion. The SHO's order explains:

> The Staff Hearing Officer denies the request for scheduled loss award for functional loss of use of the left leg, as not substantiated by the medical evidence on file.
>
> This finding is based upon the independent medical examination report of Paul Martin, M.D. dated 05/04/2015 indicating that there is insufficient medical evidence to support a total functional loss of use of the left leg. Dr. Martin specifically finds Injured Worker, while limited in her usage of her left leg, still utilizes the leg for balance and ambulation. Dr. Martin further comments that the physical therapy notes from 02/09/2015 forward, document Injured Worker's ability to go up and down ten carpeted stairs with her quad cane, notes independence with mobility and transfers, and reports the ability to stand greater than 30 minutes.
>
> The Staff Hearing Officer has additionally reviewed the video surveillance on 05/04/2015 confirming Injured Worker's ability to ambulate with her quad cane independently.
>
> The Staff Hearing Officer finds based upon the Injured Worker's ability to ambulate independently with the use of the cane, that she fails to meet the requisite elements for a scheduled loss award for total functional loss of use of the left leg.

{¶ 36} 26. On September 1, 2015, another SHO mailed an order refusing relator's appeal from the SHO's order of July 27, 2015.

{¶ 37} 27. On November 5, 2015, relator, Sandra Waite, filed this mandamus action.

Conclusions of Law:

{¶ 38} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.

**Commission Denial of the Motion for an Award for Loss of Use of a Leg**

{¶ 39} R.C. 4123.57(B) provides for a schedule of compensable losses for enumerated body parts. For the "loss of a leg," the statute provides for an award of 200 weeks of compensation.

{¶ 40} "Loss" within the meaning of the statute includes not only amputation, but also the loss of use of the affected body part. *State ex rel. Wyrick v. Indus. Comm.,* 138 Ohio St.3d 465, 2014-Ohio-541, ¶ 10 (citing *State ex rel. Moorehead v. Indus. Comm.,* 112 Ohio St.3d 27, 2006-Ohio-6364).

{¶ 41} The loss of use need not be absolute if the claimant has "suffered the permanent loss of use of the injured bodily member for all practical intents and purposes." *Wyrick* at ¶ 10, citing *State ex rel. Alcoa Bldg. Prods. v. Indus. Comm.,* 102 Ohio St.3d 341, 2004-Ohio-3166, ¶ 12.

{¶ 42} *Alcoa* is the seminal case on the subject of R.C. 4123.57(B) loss of use. Therefore, it is helpful to review the *Alcoa* case.

{¶ 43} In *Alcoa,* the court considered the loss of use application of a claimant whose left arm had been amputated below the elbow. Hypersensitivity prevented the claimant from using a prosthesis, but his employer nevertheless opposed compensation for a total loss of use of the arm, arguing that the claimant had been observed tucking a paper under his remaining arm segment and using his arm segment to push open a car door. *Alcoa* claimed that these functions would be foreclosed to one whose arm had been severed at the shoulder and, thus, precluded a total loss award. *See State ex rel. Kroger Co. v. Johnson,* 128 Ohio St.3d 243, 2011-Ohio-530, ¶ 11.

{¶ 44} The *Alcoa* court rejected *Alcoa's* argument:

> Scheduled awards pursuant to R.C. 4123.57(B) compensate for the "loss" of a body member and were originally confined to amputations, with the obvious exceptions of hearing and sight. In the 1970s, two cases - *State ex rel. Gassmann v. Indus. Comm.* (1975), 41 Ohio St.2d 64, 70 Ohio Op.2d 157, 322 N.E.2d 660, and *State ex rel. Walker v. Indus. Comm.* (1979), 58 Ohio St.2d 402, 12 Ohio Op.3d 347, 390 N.E.2d 1190 - construed "loss," as similarly used in R.C. 4123.58, to include loss of use without severance. *Gassmann* and *Walker* both involved paraplegics. In sustaining each of their scheduled loss awards, we reasoned that "for all practical

purposes, relator has lost his legs to the same effect and extent as if they had been amputated or otherwise physically removed." *Gassmann,* 41 Ohio St.2d at 67, 70 Ohio Op.2d 157, 322 N.E.2d 660; *Walker,* 58 Ohio St.2d at 403-404, 12 Ohio Op.3d 347, 390 N.E.2d 1190. *Alcoa* urges the most literal interpretation of this rationale and argues that because claimant's arm possesses some residual utility, the standard has not been met. The court of appeals, on the other hand, focused on the opening four words, "for all practical purposes." Using this interpretation, the court of appeals found that some evidence supported the commission's award and upheld it. For the reasons to follow, we affirm that judgment.

*Alcoa's* interpretation is unworkable because it is impossible to satisfy. *Walker* and *Gassmann* are unequivocal in their desire to extend scheduled loss benefits beyond amputation, yet under *Alcoa's* interpretation, neither of those claimants would have prevailed. As the court of appeals observed, the ability to use lifeless legs as a lap upon which to rest a book is a function unavailable to one who has had both legs removed, and under an absolute equivalency standard would preclude an award. And this will always be the case in a nonseverance situation. If nothing else, the presence of an otherwise useless limb still acts as a counterweight - and hence an aid to balance - that an amputee lacks. Alcoa's interpretation would foreclose benefits to the claimant who can raise a mangled arm sufficiently to gesture or point. It would preclude an award to someone with the hand strength to hold a pack of cards or a can of soda, and it would bar - as here - scheduled loss compensation to one with a limb segment of sufficient length to push a car door or tuck a newspaper. Surely, this could not have been the intent of the General Assembly in promulgating R.C. 4123.57(B) or of *Gassmann* and *Walker.*

*Id.* at ¶ 10-11.

{¶ 45} Because relator's situation has involved her use of a double upright ankle foot orthosis (AFO) brace, custom made shoes, and a quad cane, the parties cite to State ex rel. Richardson v. Indus. Comm., 10th Dist. No. 04AP-724, 2005-Ohio-2388.

{¶ 46} On November 7, 2001, John Richardson, sustained serious injury when he fell approximately 40 feet from a "cherry picker." Following allowance of the industrial claim, Richardson moved for an R.C. 4123.57(B) scheduled loss award for an alleged loss

of use of his left foot.  Richardson's motion prompted the Ohio Bureau of Workers' Compensation to seek a file review from M.E. Gibson, M.D.  On September 17, 2003, Dr. Gibson issued his report.

{¶ 47} Richardson's motion also prompted the commission to have relator examined by Keith Wilkey, M.D.  Dr. Wilkey examined Richardson on October 14, 2003, and then issued a report.

{¶ 48} Following a March 19, 2004 hearing, an SHO issued an order denying Richardson's motion for an R.C. 4123.57(B) award for an alleged loss of use of his left foot.  In the order, the SHO stated reliance upon the reports of Drs. Gibson and Wilkey.  In the order, the SHO noted that "Dr. Gibson advised that the injured worker does ambulate with the use of a foot drop brace and to this extent, the left ankle and foot are functional."  *Id.* at ¶ 21.  The SHO also notes that Dr. Wilkey opined that although the injured worker's injury is significant and debilitating, the injured worker has a functional platform from which to ambulate.  *Id.* at ¶ 21.

{¶ 49} Following commission denial of his motion, Richardson filed a mandamus action in this court.

{¶ 50} As the magistrate noted in his decision, one of the issues was whether the commission abused its discretion by determining that Richardson retained significant functional capacity in his left foot through the use of a corrective brace for the foot drop. *Id.* at ¶ 37.

{¶ 51} In its decision adopting the magistrate's decision, this court, in *Richardson,* reviewed the reports of Drs. Gibson and Wilkey upon which the commission had relied to deny the motion.

{¶ 52} This court stated:

> He argues that, while he may be ambulatory with the aid of a foot drop brace, he is still entitled to a loss of use award because his "foot is painful with use, it is worse than if it were non-existent * * *." (Objection of Relator, at 4.) But the standards set forth by all of the aforementioned authorities do not turn on the question whether the claimant's overall situation, with respect to pain and suffering, is better or worse than it would have been had his limb been amputated. Therefore, claimant's argument in this regard is not well taken.

Rather, when a claimant seeks a scheduled loss award, the proper inquiry is whether, taking into account both medical findings and real functional capacity, the body part for which the scheduled loss award is sought is, for all practical purposes, unusable to the same extent as if it had been amputated or otherwise physically removed. We agree with the magistrate's conclusion that the evidence upon which the commission relied supports its finding that relator's foot does not meet this standard.

Relator argues that Dr. Wilkey's report did not address the proper body part (that is, the left foot) because Dr. Wilkey focused on the "sciatic nerve lesion" allowance. However, Dr. Wilkey noted subjective and objective findings with respect to pain in relator's left leg and foot, the fact that relator walks with a "significant limp," "complete loss of active dorsiflexion and eversion" in relator's ankle, and lack of dorsiflexion of the toes, as well as the sensations present in relator's foot. Dr. Wilkey opined that, although this injury is significant and debilitating, it does not constitute a total, permanent loss of use. It clearly does not equate with an amputation."

In his report, Dr. Gibson explicitly indicated that the question posed to him was whether the allowed conditions have resulted in a total, permanent loss of use of the left foot as if amputated. He equated weight-bearing capability with the absence of a total and permanent loss of use. He took into account the lack of flexion in the foot, as well as the pain, numbness and weakness present. However, he noted that with a foot drop brace relator can ambulate. Based upon this capability, Dr. Gibson opined that the foot is functional and "could not be compared to an amputation or total loss of function of the left foot." The findings in the Wilkey and Gibson reports do not render relator's situation similar to that in *Alcoa*, where the claimant's partially amputated arm lacked functional capacity because it could be used for little other than petting a dog or pushing open a car door. This case is also not akin to *Walker,* in which the claimant's paralyzed legs could not be used except as a resting place for reading material or a plate of food.

Relator argues that his affidavit, in which he describes the constant pain he experiences in his left foot, demonstrates that the Wilkey and Gibson reports are fatally flawed because they do not take into account relator's chronic pain. But

> relator's pain need not be considered by these experts or the commission, even under *Schultz* and *Timmerman Truss,* if the same does not affect his *functional capacity.* No expert, including relator's examining physician, Dr. Siegel, reported that relator's pain is so intense and uncontrollable that it renders his foot unable to bear weight, resulting in an inability to walk. Here, the reports of Drs. Wilkey and Gibson establish that relator *can walk,* albeit with the help of a brace. Thus, the commission did not abuse its discretion in finding that relator has not sustained a total loss of its use. The court cannot imagine a more paramount use for a foot than the activity of walking.

(Emphasis sic.) *Id.* at ¶ 6-10.

{¶ 53} The parties here also argue *State ex rel. Bushatz v. Indus. Comm.,* 10th Dist. No. 10AP-541, 2011-Ohio-2613, a case that applies the *Richardson* case.

{¶ 54} Ronald Bushatz sustained serious low back injuries and a "left foot drop" from a September 9, 1993 work-related incident.  On July 10, 2008, Bushatz moved for an R.C. 4123.57(B) award for loss of use of his left foot.  In support of his motion, Bushatz submitted a June 3, 2008 report from Nancy Renneker, M.D.  With regards to his left foot, Dr. Renneker reported:

> Ronald Bushatz complains of * * * constant paresthesia about left ankle and Ronald Bushatz reports that he has constant "pins and needles" throughout entire left foot. Ronald Bushatz reports that by the end of his day his left lower leg-left ankle and foot is "red". Ronald Bushatz denies any left lower leg swelling. * * * Ronald Bushatz is able to stand for a maximum interval of 10 minutes, able to walk a maximum distance of 40 to 50 yards on a level surface and Mr. Bushatz needs at least one sturdy railing to negotiate steps. Ronald Bushatz is unable to run and Ronald Bushatz reports that the further he walks that he [sic] more difficult it is to continue to walk due, in part, to left lower leg-left ankle and foot weakness.

*Bushatz,* Appended Magistrate's Decision.

{¶ 55} On September 22, 2008, Dr. Renneker provided an addendum:

> Based on medical records reviewed and my exam it is still my medical opinion that Ronald Bushatz is entitled to a total loss of use of his left ankle and foot due to persistent/chronic ongoing left lower extremity radiculopathy with left foot slap

with gait. Ronald Bushatz has lost the ability to perform many activities of daily living due to this condition and his left foot and ankle due [sic] not perform as one would expect a functional foot to perform. The foot is not missing so it is capable of being a helper device in standing and walking but it [is] functionally useless in performing these activities on a regular basis. It is still my medical opinion that Ronald Bushatz would benefit from a prescribed custom molded right AFO (ankle-foot-orthosis) with a dorsi-assist. Without this custom made brace, Ronald Bushatz is at risk for a flow-through type injury as Mr. Bushatz must use excessive hip flexion in order to clear his left ankle and foot during swing phase of gait and Mr. Bushatz could easily trip if he does not clear his left toes and he could then sustain a fall resulting in a pending injury.

*Bushatz,* Appended Magistrate's Decision.

{¶ 56} Following a September 24, 2008 hearing, an SHO vacated the prior decision of the DHO and awarded compensation to Bushatz for loss of use of the left foot.  The SHO order explains:

The injured worker testified that he has no feeling in his left foot up to his mid-calf area. He has a severe left foot drop to the extent that without his current brace, he would only be able to walk by raising his left hip and knee high enough so as to clear the distance to the next step. Since he has no feeling in his foot, he cannot tell whether the foot is safely settled in position; therefore, putting weight on his left foot is problematic.

The injured worker now wears a brace that extends up to his mid-calf and keeps his foot in one stable, flexed position. With his brace, he can walk (though still with [a] lot of hip and knee involvement), stand and bend down. Better stated, "but for" his brace, he would be unable to walk, balance, or stand.

Accordingly, it is concluded that the injured worker's mobility relies exclusively upon his brace, as if his foot did not exist at all.

*Bushatz,* Appended Magistrate's Decision.

{¶ 57} On January 13, 2009, the commission exercised continuing jurisdiction over the SHO's order of September 24, 2008. In denying Bushatz's motion, the three-member commission explained:

> It is undisputed that the Injured Worker is able to walk, with the left foot, as long as a foot-drop brace is utilized. This fact pattern is substantially similar to the fact pattern in the *Richardson* decision wherein the 10th District Court of Appeals could not "imagine a more paramount use for a foot than the activity of walking," *Id.* at page 10.
>
> The Commission further finds that the correct standard, in an alleged "loss of use" situation, is whether the Injured Worker has suffered the permanent loss of use of the injured bodily member, for "all practical intents and purposes." *State ex rel. Alcoa Building Products v. Indus. Comm.* (2004), 102 Ohio St.3d 341, 2004 Ohio 3166, 810 N.E.2d 946. The Commission finds the Injured Worker retains significant, if not complete functional use of the left foot, and in accordance with the *Alcoa* decision, the Commission finds the Injured Worker is not entitled to compensation for the total loss of use of the left foot.
>
> The Injured Worker argued that his foot is only functional through the use of a foot-drop brace and that his entitlement to loss of use compensation should be evaluated without consideration given to the corrective device. The Commission rejects this argument. R.C. 4123.57(B) does not equate the loss of use of an extremity with its unaided/uncorrected use. While compensation for loss of vision is limited to that attributable to "uncorrected" vision, no such limitation is enumerated for the loss of a foot. The rules of statutory interpretation dictate that the Commission not read into the statute a meaning not specifically enumerated therein.
>
> Moreover, the *Richardson* Court's evaluation did not hinge upon the uncorrected use of the foot. Like the circumstances herein, Richardson could not ambulate without a foot-drop brace on his left foot. The Court considered whether the foot was unusable as if it had been amputated, the *Alcoa* test, but did not exclude from that consideration the aid rendered by the brace.

> Accordingly, the Commission finds the Injured Worker has not lost the total use of his left foot, as evidenced by his ability to walk with a brace. Compensation for loss of use of the left foot is denied.

*Bushatz,* Appended Magistrate's Decision.

{¶ 58} Bushatz then filed a mandamus action in this court.  Ultimately, this court adopted the magistrate's decision.

{¶ 59} Relying upon *Richardson,* the *Bushatz* court denied the writ.  The *Bushatz* court states:

> The magistrate found that the commission properly applied the law and did not abuse its discretion by refusing to evaluate relator's loss of use without consideration of the correction provided by the foot brace. Accordingly, the magistrate recommended that this court deny the requested writ of mandamus.
>
> * * *
>
> * * * [W]e find the magistrate has properly determined the pertinent facts and applied the appropriate law. We, therefore, adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein.

*Bushatz* at ¶ 2, 4.

{¶ 60} Some observations are in order.  The SHO's order of July 27, 2015 relies exclusively upon the May 4, 2015 medical report of Dr. Martin for the relied upon medical evidence (the SHO also stated reliance upon the May 4, 2015 video surveillance).

{¶ 61} Thus, the SHO rejected the reports of treating podiatrist Dr. Mendeszoon, and particularly his February 25, 2015 report submitted in support of relator's March 2, 2015 motion.  It can be further observed that, just three days after the February 25, 2015 report, relator was examined on February 28, 2015 by Dr. Mendeszoon, who authored extensive office notes.

{¶ 62} In his February 25, 2015 report, Dr. Mendeszoon opines that relator "will never be able to walk on her left leg again."  However, on February 28, 2015, Dr. Mendeszoon wrote:

> I believe we can progress the patient to a walking shoe regular shoes with an Arizona brace on left side. By getting her out of this double upright AFO and heavy shoe an Arizona brace or regular sneaker should be extremely helpful and much more light weight issue allowed to ambulate more comfortably.

{¶ 63} Dr. Mendeszoon's reports of February 25 and 28, 2015 are inconsistent. In any event, the reports were not relied upon by the commission.

{¶ 64} Thus, the main issue before this court is whether the May 4, 2015 report of Dr. Martin provided some evidence upon which the commission can and did rely to support denial of relator's motion.  Clearly, Dr. Martin's report provides the some evidence to support the commission's decision.

{¶ 65} As the SHO's order indicates, Dr. Martin reviewed the February 9, 2015 physical therapy notes which are previously described in the magistrate's findings of fact at paragraph 15.  Dr. Martin relied upon the February 9, 2015 physical therapy notes in reaching his opinion that relator does not suffer loss of use of her left leg.

{¶ 66} The February 9, 2015 notes provided Dr. Martin with a medical basis supporting his medical opinion.  That is, as of February 9, 2015, relator had the "ability to go up and down ten carpeted stairs with her quad cane, notes independence with mobility and transfers, and reports the ability to stand greater than 30 minutes."

{¶ 67} It can be further noted that relator does not argue that Dr. Martin's report is equivocal.  *State ex rel. Eberhardt v. Flxible Corp.*, 70 Ohio St.3d 649, 657 (1994). Nor does relator argue that Dr. Martin's report is internally inconsistent.  *State ex rel. Lopez v. Indus. Comm.*, 69 Ohio St.3d 445 (1994); *State ex rel. Taylor v. Indus. Comm.*, 71 Ohio St.3d 582 (1995).  Moreover, relator does not argue that Dr. Martin applied an incorrect standard for determining loss of use.

{¶ 68} Rather, relator suggests that Dr. Martin's report must be removed from evidentiary consideration because allegedly Dr. Martin was unaware that relator had

used a so-called double upright ankle foot orthosis ("AFO") brace and that relator's left leg is significantly shorter than her right leg.  (Relator's Brief, 14.)

{¶ 69} As earlier noted, Dr. Mendeszoon's February 28, 2015 office note recommends "getting her out of this double upright AFO and heavy shoe. [A]n Arizona brace or regular sneaker should be extremely helpful * * *."  In his February 25, 2015 report in support of the motion, Dr. Mendeszoon does not mention relator's use of a brace or that one foot is significantly shorter.

{¶ 70} In his May 4, 2015 report, Dr. Martin reports that "Dr. Mendeszoon has currently recommended that she be provided a new brace * * *."  While Dr. Martin does not date Dr. Mendeszoon's recommendation, in all probability, it is a reference to Dr. Mendeszoon's February 28, 2015 office note.

{¶ 71} Moreover, in his report, Dr. Martin lists the medical records he reviewed. Among the records listed is "[m]edical records from Dr. Mendeszoon, DPM."

{¶ 72} Given the above analysis, it can be presumed that Dr. Martin was aware of Dr. Mendeszoon's February 28, 2015 office note regarding the "double upright AFO and heavy shoe."

{¶ 73} Based upon the above analysis, it is clear that Dr. Martin's report is some evidence supporting the commission's denial of relator's motion.  Also, relator has failed her burden of showing that the commission abused its discretion in rendering its decision.

**The Request to Allow Dr. Mendeszoon to Testify at Hearing by Telephone**

{¶ 74} By letter dated July 22, 2015, relator's counsel wrote to the Cleveland hearing administrator:

> We respectfully request that Dr. [Mendeszoon], claimant's physician of record, be granted approval to appear via telephone for the hearing scheduled for Monday, July 27, 2015 at 11:00 a.m. This request is being made because Dr. [Mendeszoon] will be out of the country and is not able to appear in person.
>
> Dr. Mendeszoon's cell phone number is * * *.

{¶ 75} On July 23, 2015, the hearing administrator mailed the following decision:

> Dr. Mendeszoon, Injured Worker's treating physician, has requested to participate at the hearing scheduled on 07/27/2015 at 02:30 p.m. in Cleveland via telephone. That request has been denied for the reason no good cause shown.

{¶ 76} As earlier noted, following a July 27, 2015 hearing, an SHO issued an order denying relator's March 10, 2015 motion for an award for an alleged loss of use of the left leg. The SHO's order of July 27, 2015 does not mention relator's July 22, 2015 request to allow Dr. Mendeszoon to testify by telephone.

{¶ 77} In her merit brief, relator argues here:

> The Staff Hearing Officer abused her discretion by refusing to allow Dr. Mendeszoon to appear via telephone at the SHO hearing. Dr. Mendeszoon's testimony was requested in order to allow him to explain how the condition of Relator's left leg met the criteria for functional loss of use of the left leg. In refusing to allow Dr. Mendeszoon's testimony, the Staff Hearing Officer arbitrarily rejected medical evidence without any knowledge as to what said evidence purported to be.

(Relator's Brief, 10.)

{¶ 78} In its brief, the commission points out that relator has no clear legal right to have her physician testify in a workers' compensation case at the administrative level. (Commission's Brief, 10.) The commission here further points out that relator failed to proffer the testimony that relator wanted to present at the July 27, 2015 hearing. (Commission's Brief, 10.)

{¶ 79} In its brief, KeyBank points out that relator "provided no information as to what additional information, if any, would be made available through this request." (KeyBank's Brief, 9.)

{¶ 80} In support of her position that the commission abused its discretion in refusing to allow hearing testimony from Dr. Mendeszoon by telephone, relator cites no statute, no administrative rule, nor any case.

{¶ 81} Notwithstanding relator's failure to cite to any authority in support of her position, the magistrate notes Ohio Adm.Code 4121-3-09, which currently provides:

> (A) Evidence and discovery.

> (1)  In every instance the proof shall be of sufficient quantum and probative value to establish the jurisdiction of the commission to consider the claim and determine the rights of the employee  injured worker  to an award. Proof may be presented by affidavit, deposition, oral testimony, written statement, document, or other forms of evidence.

{¶ 82} While Ohio Adm.Code 4121-3-09(A)(1) provides that proof may be presented by "oral testimony," it does not directly answer the question of whether a commission hearing officer may allow testimony by telephone, nor does it present a clear legal right to present testimony by telephone.

{¶ 83} It is axiomatic that in mandamus, the creation of the legal duty that a relator seeks to enforce is the distinct function of the legislative branch of government, and courts are not authorized to create the legal duty enforceable in mandamus.  *State ex rel. Pipoly v. State Teachers Retirement Sys.,* 95 Ohio St.3d 327, 2002-Ohio-2219.

{¶ 84} In mandamus, the relator must prove his or her entitlement to the writ by clear and convincing evidence.  *State ex rel. Doner v. Zody,* 130 Ohio St.3d 446, 2011-Ohio-6117.

{¶ 85} Based on the foregoing analysis, the magistrate finds that relator has failed to prove by clear and convincing evidence a clear legal right to present Dr. Mendeszoon's testimony by telephone.

{¶ 86} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
KENNETH W. MACKE

**NOTICE TO THE PARTIES**

> Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).